(Slip Opinion) OCTOBER TERM, 2021 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PATEL ET AL. *v.* GARLAND, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 20–979.   Argued December 6, 2021—Decided May 16, 2022

In 2007, Pankajkumar Patel, who had entered the United States illegally with his wife Jyotsnaben in the 1990s, applied to United States Citizenship and Immigration Services (USCIS) for discretionary adjustment of status under 8 U. S. C. §1255, which would have made Patel and his wife lawful permanent residents.  Because USCIS was aware that Patel had previously checked a box on a Georgia driver's license application falsely stating that he was a United States citizen, it denied Patel's application for failure to satisfy the threshold requirement that the noncitizen be statutorily admissible for permanent residence.  §1255(i)(2)(A); see also §1182(a)(6)(C)(ii)(I) (rendering inadmissible a noncitizen "who falsely represents . . . himself or herself to be a citizen of the United States for any purpose or benefit under" state or federal law).

 Years later, the Government initiated removal proceedings against Patel and his wife due to their illegal entry.  Patel sought relief from removal by renewing his adjustment of status request.  Patel argued before an Immigration Judge that he had mistakenly checked the "citizen" box on the state application and thus lacked the subjective intent necessary to violate the federal statute.  The Immigration Judge disagreed, denied Patel's application for adjustment of status, and ordered that Patel and his wife be removed from the country.  The Board of Immigration Appeals dismissed Patel's appeal.

 Patel petitioned the Eleventh Circuit for review, where a panel of that court held that it lacked jurisdiction to consider his claim.  Federal law prohibits judicial review of "any judgment regarding the granting of relief" under §1255.  §1252(a)(2)(B)(i).   But see §1252(a)(2)(D) (exception where the judgment concerns "constitutional claims" or "questions of law").  The panel reasoned that the factual

determinations of which Patel sought review—whether he had testified credibly and whether he had subjectively intended to misrepresent himself as a citizen—each qualified as an unreviewable judgment. On rehearing, the en banc court agreed with the panel. This Court granted certiorari to resolve a Circuit conflict as to the scope of §1252(a)(2)(B)(i).

*Held*: Federal courts lack jurisdiction to review facts found as part of discretionary-relief proceedings under §1255 and the other provisions enumerated in §1252(a)(2)(B)(i). Pp. 6–17.

(a) This case largely turns on the scope of the word "judgment" as used in §1252(a)(2)(B)(i). In support of the judgment below, Court-appointed a*micus* defines it as any authoritative decision—encompassing any and all decisions relating to the granting or denying of discretionary relief. By contrast, the Government argues that it refers exclusively to a decision requiring the use of discretion, which the factual findings in this case are not. Patel agrees that "judgment" implies an exercise of discretion but interprets the qualifying phrase "regarding the granting of relief" as focusing the jurisdictional bar on only the Immigration Judge's ultimate decision whether to grant relief. Everything else, he says, is reviewable. Pp. 6–14.

(1) Only *amicus*' definition fits the text and context of §1252(a)(2)(B)(i). "[T]he word 'any' has an expansive meaning." *Babb* v. *Wilkie*, 589 U. S. ___, ___, n. 2 (some internal quotation marks omitted). As applied here, "any" means a judgment "'of whatever kind'" under §1255 and the other enumerated provisions. *United States* v. *Gonzales,* 520 U. S. 1, 5. The word "regarding" has a similarly "broadening effect." *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U. S. ___, ___. Thus, §1252(a)(2)(B)(i) encompasses not just "the granting of relief" but also any judgment *relating to* the granting of relief. *Amicus*' reading is reinforced by Congress' later addition of §1252(a)(2)(D), which preserves review of legal and constitutional questions but makes no mention of preserving review of questions of fact. Moreover, this Court has already relied on subparagraph (D) to all but settle that judicial review of factfinding is unavailable. See *Guerrero-Lasprilla* v. *Barr*, 589 U. S. ___; *Nasrallah* v. *Barr,* 590 U. S. ___ (2020). Pp. 8–10.

(2) The Government's and Patel's interpretations read like elaborate efforts to avoid the text's most natural meaning. The Government cites dictionary definitions such as "the mental or intellectual process of forming an opinion or evaluation by discerning and comparing" as indicating that "judgment" refers exclusively to a discretionary decision, which it describes as one that is "subjective or evaluative." Brief for Respondent 12. The factual findings in this case, it says, do not fit that description. The Government is wrong about both text and context. A "judgment" does not necessarily involve discretion, nor does

context indicate that only discretionary judgments are covered by
§1252(a)(2)(B)(i).  Rather than delineating a special category of discre-
tionary determinations, the cited definitions—none of which expressly
references discretion—simply describe the decisionmaking process,
which might involve a matter that the Government treats as "subjec-
tive" or one that it deems "objective."  Using the word "judgment" to
describe the fact determinations at issue in this case is perfectly natu-
ral.  See, *e.g., Teva Pharmaceuticals USA, Inc.* v. *Sandoz, Inc.*, 574
U. S. 318, 327.  To succeed, the Government must show that in context,
the *kind* of judgment to which §1252(a)(2)(B)(i) refers is discretionary.
But the text of that provision applies to "*any* judgment."  Had Congress
intended to limit the jurisdictional bar to "discretionary judgments," it
could easily have used that language, as it did elsewhere in the immi-
gration code.  The Government's reliance on *Kucana* v. *Holder,* 558
U. S. 233, is inapposite.  That case said or implied nothing about re-
view of nondiscretionary decisions.  Pp. 10–13.

    (3) Neither does Patel's interpretation square with the text or con-
text of §1252(a)(2)(B)(i).  He claims that the phrase "any judgment *re-
garding the granting of relief*" refers only to the ultimate grant or de-
nial of relief, leaving *all* eligibility determinations reviewable.  Patel's
interpretation reads "regarding" out of the statute entirely.  Patel also
fails to explain why subparagraph (B)'s bar should be read differently
from subparagraph (C)'s prohibition on reviewing final orders of re-
moval for certain criminal offenses.  Given the similarities of those two
provisions—each precludes judicial review in the same way and bears
the same relationship to subparagraph (D)—there is no reason to think
that subparagraph (B) would allow a court to review the factual un-
derpinnings of a decision when subparagraph (C) prohibits just that.
Pp. 13–14.

  (b) Patel and the Government object that this Court's interpretation
would arbitrarily prohibit review of some factual determinations made
in the discretionary-relief context that would be reviewable if made
elsewhere in removal proceedings.  But the distinction simply reflects
Congress' choice to provide reduced procedural protection for discre-
tionary relief.  And while this Court does not decide what effect, if any,
its decision has on review of discretionary-relief determinations made
outside of removal proceedings, the Court rejects Patel's and the Gov-
ernment's contention that the risk of foreclosing such review should
change its interpretation here.  As the Court has emphasized many
times before, policy concerns cannot trump the best interpretation of
the statutory text.  Pp. 15–17.

  (c) As a last resort, Patel and the Government argue that the statute
is ambiguous enough to trigger the presumption that Congress did not
intend to foreclose judicial review.  Here, however, the text and context

of §1252(a)(2)(B)(i) clearly indicate that judicial review of fact determi-
nations is precluded in the discretionary-relief context, and the Court
has no reason to resort to the presumption of reviewability.  P. 17.

971 F. 3d 1258, affirmed.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and THOMAS, ALITO, and KAVANAUGH, JJ., joined.  GORSUCH, J.,
filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ.,
joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–979

## PANKAJKUMAR S. PATEL, ET AL., PETITIONERS *v.* MERRICK B. GARLAND, ATTORNEY GENERAL

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT*

[May 16, 2022]

JUSTICE BARRETT delivered the opinion of the Court.

Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal. At the same time, there is room for mercy: Congress has given the Attorney General power to grant relief from removal in certain circumstances.

Federal courts have a very limited role to play in this process. With an exception for legal and constitutional questions, Congress has barred judicial review of the Attorney General's decisions denying discretionary relief from removal. We must decide how far this bar extends—specifically, whether it precludes judicial review of factual findings that underlie a denial of relief. It does.

I

A

A noncitizen who enters the United States illegally or who otherwise violates its laws may be removed from the country. 8 U. S. C. §§1182, 1227, 1229a. Removal proceedings are conducted by immigration judges in the United

States Department of Justice who exercise the authority of the Attorney General. §1229a(a)(1); 8 CFR §§1240.1(a)(1), 1245.2(a)(1)(i) (2021). If an immigration judge decides that a noncitizen is removable, the judge is authorized to order the removal of the noncitizen from the United States. 8 U. S. C. §1229a(c)(5).

Being found removable is not always the end of the story, though, because Congress has authorized relief from removal in certain contexts. For example, the Attorney General has discretion to adjust the status of an eligible noncitizen who entered the United States illegally to that of lawful permanent resident, forgiving the illegal entry and protecting the noncitizen from removal on that ground. See §1255(i). (As with authority over removal generally, the Attorney General has delegated to immigration judges the ability to grant relief from removal. 8 CFR §1240.1(a)(1)(ii).) To be eligible for such relief, a noncitizen must show that he satisfies various threshold requirements established by Congress. Yet eligibility only gets a noncitizen so far. Because relief from removal is always "'a matter of grace,'" even an eligible noncitizen must persuade the immigration judge that he merits a favorable exercise of discretion. *INS* v. *St. Cyr*, 533 U. S. 289, 308 (2001). And if the judge decides that denial would be appropriate regardless of eligibility, the judge need not address eligibility at all. See *INS* v. *Bagamasbad*, 429 U. S. 24, 25–26 (1976) (*per curiam*).

Congress has sharply circumscribed judicial review of the discretionary-relief process. Title 8 U. S. C. §1252(a)(2)(B) provides:

"Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in sub-

paragraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—

"(i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title."

This bar has an important qualification: "Nothing in subparagraph (B) . . . shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." §1252(a)(2)(D). Notably, this qualification does not preserve review of questions of fact.

B

Pankajkumar Patel and his wife Jyotsnaben entered the United States illegally in the 1990s. In 2007, Patel applied to United States Citizenship and Immigration Services (USCIS) (a component of the Department of Homeland Security (DHS)) for adjustment of status under §1255(i). See 8 CFR §245.2(a)(1) (giving USCIS authority over applications for adjustment of status made outside of removal proceedings). If granted, this adjustment would have excused Patel's illegal entry and made him a lawful permanent resident. (Patel's wife, the other petitioner in this case, applied for derivative adjustment of status based on Patel's application.) While his request to USCIS was pending, Patel also applied for a Georgia driver's license. On that application, he checked a box falsely stating that he was a United States citizen.

USCIS denied Patel's application for adjustment of status because of that misrepresentation. One of the eligibility requirements for adjustment is that the noncitizen be statutorily admissible for permanent residence. 8 U. S. C. §1255(i)(2)(A). USCIS decided that Patel failed to satisfy

this requirement. Section 1182(a)(6)(C)(ii)(I) renders inadmissible an "alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under" state or federal law. The Board of Immigration Appeals (BIA) has interpreted this provision to apply when a noncitizen (1) makes a false representation of citizenship (2) that is material to a purpose or benefit under the law (3) with the subjective intent of obtaining the purpose or benefit. *Matter of Richmond*, 26 I. & N. Dec. 779, 786–787 (2016). Applying this test, USCIS concluded that Patel had violated §1182(a)(6)(C)(ii)(I) and was therefore ineligible for status adjustment.

Several years later, DHS initiated removal proceedings against the Patels because they were present in the United States without having been admitted—the same illegal entry that Patel had sought to remedy in his initial application for adjustment of status. See §1182(a)(6)(A)(i). Patel conceded that he was removable on that ground but sought relief from removal by repeating his request for discretionary adjustment to lawful permanent resident status.

Now before an Immigration Judge, Patel's request for relief raised the same question that had been at issue in his application before USCIS: whether the misrepresentation of citizenship on his driver's license application rendered him ineligible for discretionary adjustment. He conceded that he had checked the "citizen" box on that application. But he argued that he had done so by accident—and therefore without the subjective intent that the BIA has interpreted §1182(a)(6)(C)(ii)(I) to require.

The Immigration Judge concluded otherwise. The judge explained that Patel was evasive when asked exactly how he had made a mistake. And though Patel testified that he had provided his alien registration number on his application, which would have identified him as a noncitizen, the actual application showed that he had not. The judge also

noted that Patel had falsely represented his manner of entry into the United States on an application for asylum. Based on this evidence, the judge found that Patel's testimony was not credible and that he had intentionally represented that he was a citizen. The judge accordingly denied Patel's application for adjustment of status and ordered that he and his wife be removed from the United States. Patel appealed the decision to the BIA, which determined that the judge's factual findings were not clearly erroneous and dismissed the appeal.

Patel petitioned the Eleventh Circuit for review, arguing that any reasonable judge would have been "compelled to conclude" that his testimony was credible and that he had made an honest mistake on the form. See §1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). A panel of that court held that it lacked jurisdiction to consider Patel's claim because federal law prohibits judicial review of "any judgment regarding the granting of relief" under §1255, the adjustment-of-status provision. §1252(a)(2)(B)(i). And the factual determinations of which Patel sought review—whether he had testified credibly and whether he had subjectively intended to misrepresent himself as a citizen—each qualified, in the panel's view, as a "judgment regarding the granting of relief." See *Patel* v. *United States Atty. Gen.*, 917 F. 3d 1319, 1327 (2019).

On rehearing en banc, both Patel and the Government argued that the panel had erred. Patel contended that the bar on judicial review applied only to the *ultimate* decision to grant or deny adjustment of status—not to any subsidiary decisions regarding an applicant's eligibility to be considered for relief. The Government argued that the bar applied not only to the ultimate decision to grant or deny relief but also to any *discretionary* determinations made at the

eligibility stage.  And in the Government's view, the Immigration Judge's factual findings were "nondiscretionary" determinations to which the bar did not apply.

A majority of the full Eleventh Circuit agreed with the panel decision and held that all factual determinations made as part of considering a request for discretionary relief fall within §1252(a)(2)(B)(i)'s prohibition on judicial review. *Patel* v. *United States Atty. Gen.*, 971 F. 3d 1258, 1272–1273 (2020).  In reaching this conclusion, the Eleventh Circuit deepened a split among the courts of appeals as to the scope of §1252(a)(2)(B)(i).[1]

We granted certiorari to resolve the conflict.  594 U. S. ___ (2021).  Because the Government has continued to take the position that §1252(a)(2)(B)(i) does not prohibit review of the fact determinations at issue, we invited Taylor A. R. Meehan to brief and argue this case, as *amicus curiae*, in support of the judgment below.  594 U. S. ___ (2021).  She has ably discharged her responsibilities.

## II

Section 1252(a)(2)(B)(i) strips courts of jurisdiction to review "any judgment regarding the granting of relief" under §1255.  The outcome of this case largely turns on the scope of the word "judgment," an issue on which the parties and

---

[1] The Fourth and Seventh Circuits appear to interpret §1252(a)(2)(B)(i) the way that the Eleventh Circuit does.  See *Jean* v. *Gonzales*, 435 F. 3d 475, 480 (CA4 2006); *Cevilla* v. *Gonzales*, 446 F. 3d 658, 660–661 (CA7 2006).  Other Courts of Appeals distinguish between discretionary and nondiscretionary judgments but do so in a way that seems to preclude all review of fact questions.  See *Castro* v. *Holder*, 727 F. 3d 125, 128–129 (CA1 2013); *Rosario* v. *Holder*, 627 F. 3d 58, 61 (CA2 2010); *Arambula-Medina* v. *Holder*, 572 F. 3d 824, 828 (CA10 2009).  The remainder to weigh in on the question take the Government's position.  See *Mendez-Moranchel* v. *Ashcroft*, 338 F. 3d 176, 178–179 (CA3 2003); *Garcia-Melendez* v. *Ashcroft*, 351 F. 3d 657, 661 (CA5 2003); *Santana-Albarran* v. *Ashcroft*, 393 F. 3d 699, 703 (CA6 2005); *Ortiz-Cornejo* v. *Gonzales*, 400 F. 3d 610, 612 (CA8 2005); *Mamigonian* v. *Biggs*, 710 F. 3d 936, 943–946 (CA9 2013).

*amicus* have three competing views.

*Amicus* maintains that "judgment" means any authoritative decision. See Webster's Third New International Dictionary 1223 (1993) ("a formal utterance or pronouncing of an authoritative opinion after judging," or "an opinion so pronounced"); 8 Oxford English Dictionary 294 (2d ed. 1989) ("[t]he pronouncing of a deliberate opinion upon a person or thing, or the opinion pronounced"). Under this broad definition, §1252(a)(2)(B)(i)'s prohibition "encompasses any and all decisions relating to the granting or denying" of discretionary relief. Brief for Court-Appointed *Amicus Curiae* 22–23. Factual findings fall within this category, *amicus* says, so the courts lack jurisdiction to review them.

The Government argues that, at least when used outside the context of a final judgment of a court, "judgment" does not refer to just any decision. According to the Government, §1252(a)(2)(B)(i)'s use of "judgment" refers exclusively to a decision that requires the use of discretion. Brief for Respondent 16–18. On this approach, some eligibility determinations are reviewable and others are not. For example, the determination that a noncitizen's removal would not result in exceptional and extremely unusual hardship for a spouse, parent, or child involves discretion (which makes it an unreviewable "judgment"), but the decision that an applicant has fewer than 10 years of continuous presence in the United States does not (which makes it reviewable). See *id.*, at 42 (citing 971 F. 3d, at 1296 (Martin, J., dissenting)); but see *Trejo* v. *Garland*, 3 F. 4th 760 (CA5 2021) (concluding to the contrary that hardship is nondiscretionary and so reviewable); *Singh* v. *Rosen*, 984 F. 3d 1142 (CA6 2021) (same). The Government classifies the factual findings at issue in this case—the Immigration Judge's conclusions that Patel's testimony was not credible and that he had lied on the form—as nondiscretionary and therefore

outside the jurisdictional bar.[2]

Patel agrees with the Government that "judgment" implies an exercise of discretion, but unlike the Government, he would not sift through eligibility determinations to classify them as discretionary or nondiscretionary. Instead, Patel reads the phrase "regarding the granting of relief" to focus the jurisdictional bar narrowly on a single discretionary judgment: the immigration judge's decision whether to grant relief to an applicant eligible to receive it. Everything else, Patel says, is reviewable. JUSTICE GORSUCH adopts Patel's approach, rejecting the Government's interpretation as well as *amicus*'. See *post*, at 8 (dissenting opinion).

## A

*Amicus*' interpretation is the only one that fits §1252(a)(2)(B)(i)'s text and context. The provision does not restrict itself to certain kinds of decisions. Rather, it prohibits review of *any* judgment *regarding* the granting of relief under §1255 and the other enumerated provisions. As this Court has "repeatedly explained," "'"the word 'any' has an expansive meaning."'" *Babb* v. *Wilkie*, 589 U. S. ___, ___, n. 2 (2020) (slip op., at 5, n. 2); see also Webster's Third New International Dictionary, at 97 (defining "any" as "one or some indiscriminately of whatever kind"). Here, "any" means that the provision applies to judgments "'of whatever kind'" under §1255, not just discretionary judgments or the last-in-time judgment. See *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997). Similarly, the use of "regarding"

_____

[2] Prior to 2001, the Government took the position that *amicus* now defends. Tr. of Oral Arg. 52–53. It adopted its current understanding as a matter of constitutional avoidance following this Court's decision in *INS* v. *St. Cyr*, 533 U. S. 289 (2001). Tr. of Oral Arg. 53–54. Though the Government says that Congress' subsequent amendments to other parts of §1252, see *infra*, at 9, "ameliorat[ed] the constitutional concerns," it has not reverted to its original interpretation of §1252(a)(2)(B)(i), Tr. of Oral Arg. 54.

"in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 7); see also Webster's Third New International Dictionary, at 1911 (defining "regarding" as "with respect to" or "concerning"). Thus, §1252(a)(2)(B)(i) encompasses not just "the granting of relief" but also any judgment *relating to* the granting of relief. That plainly includes factual findings.

Section 1252(a)(2)(D), which preserves review of constitutional claims and questions of law, reinforces that conclusion. Congress added this subparagraph after we suggested in *St. Cyr* that barring review of all legal questions in removal cases could raise a constitutional concern. See 533 U. S., at 300, 314. The amendment is precise. While Congress could have responded to *St. Cyr* by lifting §1252's prohibitions on judicial review altogether, it instead excised only the legal and constitutional questions that implicated our concern. See §1252(a)(2)(D) ("Nothing in subparagraph (B) or (C)" or other similar provisions "shall be construed as precluding review of constitutional claims or questions of law"); §§1252(a)(2)(B), (C) (continuing to prohibit review "except as provided in subparagraph (D)"). And if Congress made such questions an exception, it must have left *something* within the rule. The major remaining category is questions of fact.

No surprise, then, that we have already relied on subparagraph (D) to all but settle that judicial review of factfinding is unavailable. In *Guerrero-Lasprilla* v. *Barr*, 589 U. S. \_\_\_ (2020), we had to decide whether subparagraph (C)—which bars review of "any final order of removal against an alien who is removable by reason of having committed" certain criminal offenses—prohibits review of how a legal standard applies to undisputed facts. Our answer turned on whether such an application counts as a question of law

for purposes of subparagraph (D).  *Id.*, at \_\_\_–\_\_\_ (slip op.,
at 3–4).  In holding that it does, we explained that subpar-
agraph (D) "will still forbid appeals of factual determina-
tions" themselves under subparagraph (C).  *Id.*, at \_\_\_–\_\_\_
(slip op., at 12–13).  Had we thought otherwise, we would
simply have said that questions of fact, like questions of
law, are reviewable—end of story.

   *Nasrallah* v. *Barr,* 590 U. S. \_\_\_ (2020), addresses Patel's
situation even more directly.  There, we held that a court
has jurisdiction to review a factual challenge to an order
denying relief under the Convention Against Torture, be-
cause that order falls outside of subparagraph (C)'s prohi-
bition on reviewing final orders of removal.  In reaching
that conclusion, we emphasized that our decision would
have "no effect" on those orders that do fall within a juris-
diction-stripping provision—including "orders denying dis-
cretionary relief" under §1252(a)(2)(B).  *Id.*, at \_\_\_ (slip op.,
at 12).  And so, we explained, a noncitizen "may not bring a
factual challenge to orders denying discretionary relief, in-
cluding . . . adjustment of status."  *Ibid.*  We adhere to that
view today.

B

   In contrast to *amicus*' straightforward interpretation,
both the Government's and Patel's arguments read like
elaborate efforts to avoid the most natural meaning of the
text.

1

   We begin with the Government's argument that "judg-
ment" refers exclusively to a "discretionary" decision, which
the Government describes as a decision that is "subjective
or evaluative."  Brief for Respondent 12.  According to the
Government, this requirement is evident in definitions like
this one: "'the mental or intellectual process of forming an
opinion or evaluation by discerning and comparing,'" or

"'an opinion or estimate so formed.'" *Id.*, at 16–17 (quoting Webster's Third New International Dictionary, at 1223). The Government's argument is subtle, to say the least, given that none of the definitions it cites expressly references discretion. Evidently, the nature of the decisionmaking process does the work: If the process occurs as the definitions describe, then the decision it yields is discretionary and counts as a judgment. And the Government says that the factual findings in this case do not fit that description.

We do not see how the Government's cited definitions narrow the field in the way that the Government claims. Rather than delineating a special category of discretionary determinations, they simply describe the decisionmaking process. That process might involve a matter that the Government treats as "subjective" or one that it deems "objective." Either counts as a judgment, even under the definitions that the Government offers.

Take the credibility determination at issue in this case. It is easily described as an "opinion or evaluation" formed "by discerning and comparing" the evidence presented. The Immigration Judge weighed Patel's testimony, reviewed documents, and considered Patel's history to conclude that he was an evasive and untrustworthy witness. Using the word "judgment" to describe that kind of credibility determination is perfectly natural—in fact, we have used it this way ourselves. See, *e.g.*, *Teva Pharmaceuticals USA, Inc.* v. *Sandoz, Inc.*, 574 U. S. 318, 327 (2015) (discussing "'credibility judgments'" about a witness). It is just as natural in other factfinding contexts, like the Immigration Judge's determination that Patel lied on his driver's license application. Finding that fact involved the same exercise of evaluating conflicting evidence to make a judgment about what happened.

So to succeed, the Government must do more than point to the word "judgment." It must show that in context, the

*kind* of judgment to which §1252(a)(2)(B)(i) refers is discretionary. But the text of the provision stops that argument in its tracks because the bar on review applies to "*any* judgment." Had Congress intended instead to limit the jurisdictional bar to "discretionary judgments," it could easily have used that language—as it did elsewhere in the immigration code. See, *e.g.*, §1226(e) ("The Attorney General's *discretionary judgment* regarding the application of this section shall not be subject to review" (emphasis added)); §1252(b)(4)(D) ("[T]he Attorney General's *discretionary judgment* whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion" (emphasis added)). We express no view about what "discretionary judgment" means in those provisions—the point is simply that the absence of any reference to discretion in §1252(a)(2)(B)(i) undercuts the Government's efforts to read it in.

The Government claims that *Kucana* v. *Holder*, 558 U. S. 233 (2010), which interpreted neighboring provision §1252(a)(2)(B)(ii), supports its argument. That provision bars review of

> "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."

We explained in *Kucana* that "[t]he proximity of clauses (i) and (ii), and the words linking them—'any other decision'— sugges[t] that Congress had in mind decisions of the same genre, *i.e.*, those made discretionary by legislation." *Id.*, at 246–247. "Read harmoniously," we said, "both clauses convey that Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Id.*, at 247.

This reference to barring review of discretionary decisions, the Government says, implies that review of nondiscretionary decisions is allowed.

*Kucana*'s discussion is inapposite. That opinion addressed whether the Attorney General could unilaterally proscribe review of decisions "declared discretionary by the Attorney General himself through regulation." *Id.*, at 237. In drawing the comparison between clauses (i) and (ii), we thus focused on the fact that each form of relief identified in clause (i) was entrusted to the Attorney General's discretion *by statute*. *Id.*, at 246. We neither said nor implied anything about review of eligibility decisions made in the course of exercising that statutory discretion.

In short, the Government is wrong about both text and context. A "judgment" does not necessarily involve discretion, nor does context indicate that only discretionary judgments are covered by §1252(a)(2)(B)(i).

2

Unlike the Government, Patel interprets §1252(a)(2)(B)(i) to prohibit review of only the ultimate grant or denial of relief, leaving *all* eligibility determinations reviewable. That, Patel says, is because the provision specifies the kind of judgment to which the bar applies: "any judgment *regarding the granting of relief*." Eligibility determinations—which Patel characterizes as "first-step decisions"—are not judgments regarding the granting of relief because eligibility is a necessary but insufficient condition for relief. The only judgment that can actually grant relief is what Patel describes as the "second-step decision" whether to grant the applicant the "'"grace"'" of relief from removal. Brief for Petitioners 20 (quoting *St. Cyr*, 533 U. S., at 308). So, Patel argues, that is the sole judgment to which the bar applies.

Like the Government, Patel cannot square his interpretation with the text of §1252(a)(2)(B)(i). He claims that his

is the only interpretation that makes sense of "regarding the granting of relief"; as he sees it, "any judgment regarding the granting of relief" must narrow the meaning of "judgment" to include only the decision "whether to grant relief." Brief for Petitioners 22–25, 37–39. To be sure, the reference to "the granting of relief" appears to constrain the provision from sweeping in judgments that have nothing to do with that subject. But as even the Government acknowledges, §1252(a)(2)(B)(i) does not stop at just the grant or denial of relief; it extends to any judgment "regarding" that ultimate decision. See Brief for Respondent 18–20. Patel's interpretation to the contrary reads "regarding" out of the statute entirely.

Context further undermines Patel's position. He cannot explain why the bar in subparagraph (B) should be read differently from subparagraph (C)'s prohibition on reviewing final orders of removal for certain criminal offenses. Patel acknowledges that this bar on review of a "final order" also precludes review of its factual support, including the very kind of factfinding at issue in this case. Reply Brief for Petitioners 7; *Guerrero-Lasprilla*, 589 U. S., at ___–___ (slip op., at 12–13). But if Congress had wanted to achieve that effect in subparagraph (B), he argues, it could have used "final order" there too, rather than "judgment." Reply Brief for Petitioners 7. Yet Patel ignores a simple explanation for the shift in terminology. Subparagraph (B) bars review of only one facet of the removal process (consideration of discretionary relief) whereas subparagraph (C) prohibits review of the entire proceeding (removal based on a criminal offense). Each statutory label describes its target, but otherwise, the provisions preclude judicial review in the same way and bear the same relationship to subparagraph (D). Given those similarities, we see no reason to think that subparagraph (B) would allow a court to review the factual underpinnings of a decision when subparagraph (C) prohibits just that.

C

Patel and the Government object that our interpretation of §1252(a)(2)(B)(i) would arbitrarily prohibit review of some factual determinations made in the discretionary-relief context that would be reviewable if made elsewhere in removal proceedings. In this case, for example, the question whether Patel intended to falsely claim to be a citizen on his driver's license application relates to whether he is statutorily inadmissible, which is both an obstacle to discretionary relief and an independent ground for removal. Presumably because Patel openly acknowledged that he was removable for entering the country illegally, the Government did not premise his removal on the contested claim that he had intentionally misrepresented his citizenship. But if the Government had taken that route, the Immigration Judge's determinations would have been reviewable in the ordinary course.

That distinction is not arbitrary. It reflects Congress' choice to provide reduced procedural protection for discretionary relief, the granting of which is "'not a matter of right under any circumstances, but rather is in all cases a matter of grace.'" *St. Cyr*, 533 U. S., at 308. That reduced protection is reflected in the burden of proof too: The Government bears the burden of proving removability by clear and convincing evidence, while an applicant bears the burden of establishing eligibility for discretionary relief. Compare §1229a(c)(3)(A) with §1229a(c)(4)(A). For both judicial review and the burden of proof, the context in which a fact is found explains the difference in protection afforded.

Patel and the Government also briefly suggest that interpreting §1252(a)(2)(B)(i) as we do will have the unintended consequence of precluding all review of USCIS denials of discretionary relief. Those decisions are made outside of the removal context, and subparagraph (D) preserves review of legal and constitutional questions only when raised in a petition for review of a final order of removal. If the

jurisdictional bar is broad and subparagraph (D) is inapplicable, Patel and the Government say, USCIS decisions will be wholly insulated from judicial review.

The reviewability of such decisions is not before us, and we do not decide it. But it is possible that Congress did, in fact, intend to close that door.[3] The post-*St. Cyr* amendments expressly extended the jurisdictional bar to judgments made outside of removal proceedings at the same time that they preserved review of legal and constitutional questions made within removal proceedings. See §§1252(a)(2)(B), (D). And foreclosing judicial review unless and until removal proceedings are initiated would be consistent with Congress' choice to reduce procedural protections in the context of discretionary relief. See *Lee* v. *USCIS*, 592 F. 3d 612, 620 (CA4 2010) ("To the extent Congress decided to permit judicial review of a constitutional or legal issue bearing upon the denial of adjustment of status, it intended for the issue to be raised to the court of appeals *during removal proceedings*"). So it would be difficult to maintain that this consequence conflicts with the statutory structure, and neither Patel nor the Government goes so far. Instead, they urge us to interpret §1252(a)(2)(B)(i) to avoid the risk of this result. Yet we inevitably swerve out of our lane when we put policy considerations in the driver's seat. As we have emphasized many times before, policy concerns cannot trump the best interpretation of the statutory text. See, *e.g.*, *Niz-Chavez* v. *Garland*, 593 U. S. ___, ___ (2021) (slip op., at 15); *Jay* v. *Boyd*, 351 U. S. 345, 357

——————
[3] The parties do not address the independent question whether a USCIS denial of adjustment of status made before the initiation of removal proceedings satisfies threshold finality and exhaustion requirements for review. There appears to be disagreement on this question in the courts of appeals. Compare *Cardoso* v. *Reno*, 216 F. 3d 512, 517–518 (CA5 2000); *McBrearty* v. *Perryman*, 212 F. 3d 985, 987 (CA7 2000), with *Pinho* v. *Gonzales*, 432 F. 3d 193, 200–202 (CA3 2005); *Cabaccang* v. *USCIS*, 627 F. 3d 1313, 1317 (CA9 2010).

(1956).

## D

As a last resort, Patel and the Government insist that the statute is ambiguous enough to trigger the presumption that Congress did not intend to foreclose judicial review. We disagree.

Because "'executive determinations generally are subject to judicial review,'" *Guerrero-Lasprilla*, 589 U. S., at \_\_\_ (slip op., at 6), we presume that review is available when a statute is silent. See *Reno* v. *Catholic Social Services, Inc.*, 509 U. S. 43, 56 (1993). But that presumption "may be overcome by specific language" in a provision or evidence "drawn from the statutory scheme as a whole." *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 349 (1984). And as we have explained in detail, the text and context of §1252(a)(2)(B)(i)—which is, after all, a jurisdiction-stripping statute—clearly indicate that judicial review of fact determinations is precluded in the discretionary-relief context. The plain meaning of that provision, not any interpretative presumption, drives our conclusion today. Because the statute is clear, we have no reason to resort to the presumption of reviewability.

\*　　\*　　\*

Federal courts lack jurisdiction to review facts found as part of discretionary-relief proceedings under §1255 and the other provisions enumerated in §1252(a)(2)(B)(i). We therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 20–979

———

## PANKAJKUMAR S. PATEL, ET AL., PETITIONERS *v.* MERRICK B. GARLAND, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[May 16, 2022]

JUSTICE GORSUCH, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

It is no secret that when processing applications, licenses, and permits the government sometimes makes mistakes. Often, they are small ones—a misspelled name, a misplaced application. But sometimes a bureaucratic mistake can have life-changing consequences. Our case is such a case. An immigrant to this country applied for legal residency. The government rejected his application. Allegedly, the government did so based on a glaring factual error. In circumstances like that, our law has long permitted individuals to petition a court to consider the question and correct any mistake.

Not anymore. Today, the Court holds that a federal bureaucracy can make an obvious factual error, one that will result in an individual's removal from this country, and nothing can be done about it. No court may even hear the case. It is a bold claim promising dire consequences for countless lawful immigrants. And it is such an unlikely assertion of raw administrative power that not even the agency that allegedly erred, nor any other arm of the Executive Branch, endorses it. Today's majority acts on its own to shield the government from the embarrassment of having to correct even its most obvious errors. Respectfully, I dissent.

# I

## A

Pankajkumar Patel has lived in the United States for nearly 30 years. He and his wife Jyotsnaben Patel currently reside in Georgia. They have three sons—one who is already a U. S. citizen, and two who are lawful permanent residents and spouses of U. S. citizens. As a young man, Mr. Patel entered the country illegally. But in 2007, he tried to make things right by applying for an adjustment of his immigration status to a lawful permanent resident (also known as a green card).

Mr. Patel had at least some reason to hope. The Immigration and Nationality Act (INA) expressly authorizes the Attorney General to grant relief in cases like his. The statute sets forth a two-step process. At the first step, the government must determine if an individual is statutorily eligible for an adjustment of status. Various circumstances specified by law, including prior criminal convictions, may render an applicant ineligible for relief. See 8 U. S. C. §§ 1255(i)(2)(A), 1182. At the second step, once an individual has established his statutory eligibility for relief, the Attorney General or his designee is entitled to grant or deny an adjustment of status "in his discretion." §§ 1255(a), (i)(2); see also 8 CFR § 1240.1(a) (2021) (delegating this authority to immigration judges). Because this second step is discretionary, "mere eligibility" for relief does not "automatically result in a grant of the application." *Matter of Arai*, 13 I. & N. Dec. 494, 495 (BIA 1970). Instead, "the actual granting of relief . . . is in all cases a matter of grace." *INS* v. *St. Cyr*, 533 U. S. 289, 308 (2001) (internal quotation marks omitted).

Seeking relief under this scheme, Mr. Patel filed an application with the necessary paperwork. Soon, the government responded by returning a document allowing Mr. Patel to continue to work and remain in the country while it processed his application. So far, so good.

But then a problem emerged. Several months after filing his application, Mr. Patel sought to renew his Georgia driver's license. When filling out the renewal form, Mr. Patel answered the question "Are you a U. S. citizen?" by checking a box that said "yes." After discovering Mr. Patel's erroneous checkmark, Georgia authorities charged him with willfully falsifying his driver's license application. Later, however, the State dropped its prosecution after concluding it lacked sufficient evidence to prove a crime. Not only has Mr. Patel consistently claimed that he intended to deceive no one and that he simply ticked the wrong box by mistake. Under Georgia law, Mr. Patel *was* eligible to receive a license without being a citizen because he had a pending application seeking lawful permanent residence and a valid employment authorization document. See Ga. Comp. Rules & Regs., Rules 375–3–1.02(3)(e), (7) (2022).

Apparently, the Department of Homeland Security (DHS) saw things differently. Operating through United States Citizenship and Immigration Services (USCIS), the agency denied Mr. Patel's application for adjustment of status, citing his faulty driver's license application. According to USCIS, Mr. Patel's conduct rendered him statutorily ineligible for adjustment of status under a provision that excludes any alien who "falsely represents . . . himself . . . to be a citizen of the United States" to obtain a "benefit under . . . State law." 8 U. S. C. §§ 1182(a)(6)(C)(ii)(I), 1255(i)(2)(A). On USCIS's view, Mr. Patel's application for adjustment of status failed at the first step—and the Attorney General was wholly without discretion to afford him relief at the second.

B

Some months later, the government elected to bring removal proceedings against Mr. Patel. As a defense to removal, Mr. Patel renewed his application for adjustment of status consistent with regulations permitting him to do so.

See 8 CFR § 245.2(a)(5)(ii). At his removal hearing, Mr. Pa-
tel repeated points he had made to state officials, insisting
that he had harbored no intent to deceive anyone, and sub-
mitting that he remained statutorily eligible for relief. See
*Matter of Richmond*, 26 I. & N. Dec. 779, 784 (BIA 2016)
(inadmissibility is triggered when a misrepresentation is
made "with the subjective intent of obtaining . . . benefits"
(internal quotation marks omitted)).

None of this moved the immigration judge. Relevant
here, the immigration judge rested his decision on a factual
finding. He said he did not believe Mr. Patel's testimony
that he checked the wrong box mistakenly. Instead, the im-
migration judge found, Mr. Patel intentionally represented
himself falsely to obtain a benefit under state law. Accord-
ing to the immigration judge, Mr. Patel had a strong incen-
tive to deceive state officials because he could not have ob-
tained a Georgia driver's license if he had disclosed he was
"neither a citizen [n]or a lawful permanent resident." And
because intentionally deceiving state officials to obtain a
benefit is enough to render an applicant statutorily ineligi-
ble for relief at step one, the immigration judge concluded,
there was no need to reach the second-step question
whether Mr. Patel warranted a favorable exercise of discre-
tion.

Mr. Patel appealed the immigration judge's ruling to the
Board of Immigration Appeals (BIA). In his appeal, Mr. Pa-
tel argued that the immigration judge's finding that he had
an incentive to deceive state officials was simply wrong—
under Georgia law he was entitled to a driver's license with-
out being a citizen or a lawful permanent resident given his
pending application for adjustment of status and permis-
sion to work. Mr. Patel submitted, too, that all the record
evidence pointed to the conclusion he simply checked the
wrong box by mistake; even state officials agreed they had
no case to bring against him for deception. In the end, how-
ever, a divided panel of the BIA rejected the appeal by a

vote of 2 to 1.

Mr. Patel next petitioned for review in the Eleventh Circuit. There, he argued that the BIA's finding that he intentionally sought to deceive state officials was wholly unreasonable given the evidence before the agency. In response, the federal government agreed that the Eleventh Circuit had the power to hear Mr. Patel's case but asked the court to affirm the BIA's decision on the merits. Instead, a panel of the Eleventh Circuit charted its own path, holding that it lacked jurisdiction to review the BIA's factual findings no matter how wrong they might be. See *Patel* v. *United States Atty. Gen.*, 917 F. 3d 1319, 1324 (2019). Eventually, the full court agreed to rehear the case and, by a vote of 9 to 5, reached the same conclusion. See *Patel* v. *United States Atty. Gen.*, 971 F. 3d 1258 (2020). In doing so, the court acknowledged that it had to overrule "numerous" circuit precedents holding that it possessed the power to review cases like Mr. Patel's. *Id.*, at 1262. It acknowledged, too, that its new ruling conflicted with the holdings of most other courts of appeals. *Id.*, at 1277, and n. 22.

## II

As it comes to us, this case poses the question: Does a federal court have statutory authority to review and correct a BIA decision holding an individual ineligible for relief when that decision rests on a glaring factual error? Today, the majority insists the answer is no. It does not matter if the BIA and immigration judge in Mr. Patel's case erred badly when they found he harbored an intent to deceive state officials. It does not matter if the BIA declares other individuals ineligible for relief based on even more obvious factual errors. On the majority's telling, courts are powerless to correct bureaucratic mistakes like these no matter how grave they may be.

It is an eye-catching conclusion. Normally in this country, federal courts shoulder the responsibility of reviewing

agency decisions to ensure they are at least supported by "substantial evidence." 5 U. S. C. § 706(2)(E). A similar, if surely more deferential, principle finds voice in the INA. As relevant here, that statute endows federal courts of appeals with the power to review "all questions of law and fact . . . arising from any action taken or proceeding brought to re- move an alien from the United States." 8 U. S. C. § 1252(b)(9). And the law further provides that a court may reject the agency's factual findings underlying an order of removal if it concludes that no "reasonable adjudicator" could adopt them. § 1252(b)(4)(B); see also *Garland* v. *Ming Dai*, 593 U. S. ___, ___ (2021) (slip op., at 7).

That is exactly the sort of argument Mr. Patel seeks to pursue. He hopes to persuade a court of law that the BIA's factual errors in his case are so obvious no reasonable fact- finder could adopt them. It is a claim expressly permitted by statute. Tellingly, in the proceedings before us the gov- ernment has continued to maintain that, however his case is finally resolved, Mr. Patel is entitled to his day in court. Nor is this some new position. For at least 20 years the government has taken the view that the law permits judi- cial review in cases like these. Yet even in the face of all this, the majority balks. It holds that no court may enter- tain Mr. Patel's challenge. And its reasoning promises that countless future immigrants will be left with no avenue to correct even more egregious agency errors.

A

How does the majority manage to reach such an unlikely conclusion? It depends on a Court-appointed *amicus* who offers arguments for the government that even the govern- ment refuses to advance on its own behalf. It turns out, too, that all of those arguments hinge on a narrow exception to the usual rule of judicial review—one found in 8 U. S. C. § 1252(a)(2)(B)(i). As relevant here, that exception reads:

"Denials of discretionary relief

   "Notwithstanding any other provision of law . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review— (i) any judgment regarding the granting of relief under section . . . 1255 of this title."

This language does not begin to do the work the majority demands of it. Recall that requests for adjustment of status involve a two-step process. First, the Attorney General, acting through the BIA, must determine whether an individual is statutorily eligible for adjustment of status. See 8 U. S. C. §§ 1255(a), (i). If so, the Attorney General may proceed to the second step and decide whether to grant an adjustment request "in his discretion." §§ 1255(a), (i)(2)(A). Undoubtedly, the exception in § 1252(a)(2)(B)(i) creates a special rule insulating from judicial review the second and purely discretionary decision. But nothing in it disturbs the general rule that courts may entertain challenges to the BIA's factual findings and legal analysis associated with its first-step eligibility determination.

This much follows directly from the statute's terms. Subparagraph (B)(i) renders unreviewable only those judgments "regarding the granting of relief." That phrase has a well-understood meaning. To "grant relief" is to supply "redress or benefit." *United States* v. *Denedo*, 556 U. S. 904, 909 (2009) (internal quotation marks omitted). And where, as here, the BIA issues a judgment only at step one, it never reaches the question whether to grant relief or supply some redress or benefit. Instead, the agency resolves only the antecedent question whether an individual is statutorily *eligible to petition* for relief, redress, or a benefit. As the BIA has explained, a judgment at step one can never "result in a grant of the application." *Arai*, 13 I. & N., at 495. Any "judgment regarding the granting of relief" comes only at

step two where the INA expressly vests the Attorney General with substantial discretion. See *St. Cyr*, 533 U. S., at 307 (noting the traditional and longstanding "distinction between *eligibility* for discretionary relief, on the one hand, and the favorable *exercise* of discretion, on the other hand" (emphasis added)).

All of which leads us back to Mr. Patel's case. Before the Eleventh Circuit, Mr. Patel sought to challenge the BIA's step-one determination that he was statutorily ineligible for adjustment of status, arguing that no reasonable adjudicator could have found the facts as the agency did. The INA expressly authorizes courts to hear claims like his. 8 U. S. C. § 1252(b)(4)(B). Unprompted, however, the Eleventh Circuit held that § 1252(a)(2)(B)(i) effectively undoes this arrangement. That court's self-directed legal analysis was mistaken. Subparagraph (B)(i) only deprives courts of jurisdiction to review the Attorney General's step-two discretionary decision to grant or deny relief, not the BIA's step-one judgments regarding whether an individual is eligible to be considered for such relief.

B

The majority, of course, offers a different view. Following the Eleventh Circuit's lead, the majority contends that subparagraph (B)(i)'s phrase "any judgment regarding the granting of relief under § 1255" sweeps more broadly. On its account, the statute denies courts the power to correct *all* agency decisions with respect to an adjustment-of-status application under § 1255—both the agency's step-one eligibility decisions and its step-two discretionary decisions. *Ante*, at 8–9. As a result, no court may correct even the agency's most egregious factual mistakes about an individual's statutory eligibility for relief. It is a novel reading of a 25-year-old statute. One at odds with background law permitting judicial review. And one even the government disavows.

It is easy to see why. We do not normally suppose that Congress blithely includes words in its laws that perform no work. See, *e.g.*, *Liu* v. *SEC*, 591 U. S. ___, ___ (2020) (slip op., at 16) (noting the "'cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute'"). Yet that is exactly what the majority's interpretation requires of us. If subparagraph (B)(i) operated as the majority imagines, Congress would have had no need to deny courts jurisdiction over "any judgment *regarding the granting of relief* under section 1255." Instead, Congress could have simply omitted the italicized words and denied jurisdiction over "any judgment under section 1255." Plainly, all those additional words must do *something*. And the work they perform is clear—the phrase directs us to the Attorney General's second-step discretionary judgment to grant relief. That alone is a judgment "regarding the granting of relief." And under the statute's terms, that judgment alone is shielded from judicial review.

The majority's attempt to resolve its surplusage problem only underscores the gravity of its error. First, the majority tells us that, as used in subparagraph (B)(i), the words "any judgment" mean "any authoritative decision." *Ante*, at 7, 8. Then the majority tells us that the phrase "regarding the granting of relief" expands the universe of covered judgments further, because the word "regarding" "'generally has a broadening effect.'" *Ante*, at 8–9. But how could that be? Under the majority's reading of the word "judgment," the statute already precludes judicial review of *any* authoritative decision "under section 1255." There is no further corner of the universe left to explore. Once more, the words *regarding the granting of relief* are left without work to perform. Rather than sort out its surplusage problem, the majority's answer only highlights its bind.

What is more, the majority's argument rests on a faulty premise. The majority insists that the word "regarding"

has "a broadening effect." *Ibid.* It even suggests that failing to give the term that effect would be to read it "out of the statute entirely." *Ante*, at 14. But in truth, the word can have either a broadening or narrowing effect depending on context. Cf. *Yates* v. *United States*, 574 U. S. 528, 537 (2015) (plurality opinion) ("In law as in life . . . the same words, placed in different contexts, sometimes mean different things"). And in subparagraph (B)(i), "regarding" is much more likely to serve a narrowing function, focusing our attention on a specific subset of judgments—namely, those step-two discretionary judgments "regarding the granting of relief."

To appreciate the point, consider a hypothetical. Imagine I said: "Please bring me any book regarding the history of the American West from that shelf of history books." In this sentence, the phrase "regarding the history of the American West" does not broaden the referenced set. Instead, it directs you to a narrow subset of books: those regarding the history of the American West. Any other interpretation misses the point and leaves me with a pile of unwanted volumes.

What is true of this hypothetical is true of subparagraph (B)(i). The phrase "regarding the granting of relief" does not expand the set—again, the sentence already speaks of "any judgment . . . under section . . . 1255." Instead, it functions as "limiting language" that narrows the kind of judgments under § 1255 the command means to cover. *iTech U. S., Inc.* v. *Renaud*, 5 F. 4th 59, 65 (CADC 2021). And here that means limiting our attention to the agency's step-two decision, the only place where it can issue a "judgment regarding the granting of relief." Any other reading renders the statute a garble.[1]

———————

[1] Perhaps sensing that its textual arguments cannot bear the weight it seeks to place on them, the majority suggests that, right or wrong, existing precedent commands its reading, pointing us to *Guerrero-Lasprilla* v. *Barr*, 589 U. S. ___ (2020), and *Nasrallah* v. *Barr*, 590 U. S. ___ (2020).

# III
## A

To the extent doubt remains about the proper construction of subparagraph (B)(i), it dissipates quickly with a look to the larger statutory context. Here the clues are many—yet the majority pauses to consider almost none of them.

Take first a neighboring statutory provision. After denying courts the power to review "any judgment regarding the granting of relief" in subparagraph (B)(i), Congress proceeded in the very next clause to deny courts jurisdiction to entertain another category of cases: "any *other* decision . . . *the authority for which is specified . . . to be in the discretion of the Attorney General*." § 1252(a)(2)(B)(ii) (emphasis added). That phrasing has a clear implication: "The proximity of clauses (i) and (ii), and the words linking them— 'any other decision'—suggests that Congress had in mind decisions of the same genre, *i.e.*, those made discretionary by legislation." *Kucana* v. *Holder*, 558 U. S. 233, 246–247 (2010). And as we have seen, the only judgment under § 1255 that fits that description is the Attorney General's second-step decision to grant or deny adjustment of status "in his discretion." §§ 1255(a), (i)(2); see also *St. Cyr*, 533 U. S., at 308 (noting that second-step decisions to grant relief are "a matter of grace").

Next, consider the other statutes subparagraph (B)(i) addresses. It doesn't just bar review of "judgments regarding

———————

*Ante*, at 9–10. But neither case speaks to, much less resolves, the question before us. *Guerrero-Lasprilla* does not even discuss subparagraph (B)(i). As for *Nasrallah*'s passing observation that an individual "may not bring a factual challenge to orders denying discretionary relief, including . . . adjustment of status," 590 U. S., at \_\_\_ (slip op., at 12), nothing about that statement conflicts with a correct reading of subparagraph (B)(i). By its terms, *Nasrallah*'s observation is explicitly limited to "determinations made discretionary by statute"—that is, step-two judgments "regarding the granting of relief," not judgments regarding statutory eligibility. *Ibid.* (internal quotation marks omitted). Once more, the majority's arguments fold quickly under pressure.

the granting of relief" under § 1255 for adjustment of sta-
tus. Subparagraph (B)(i) *also* bars review of "judgment[s]
regarding the granting of relief under section[s] 1182(h),
1182(i), 1229b, [and] 1229c." § 1252(a)(2)(B)(i). These pro-
visions bear many differences. But they all have one thing
in common: a two-step structure in which the Attorney
General makes a statutory determination, followed by a
step-two discretionary decision whether to grant relief.[2]
That hardly seems a coincidence. More likely, it is further
indication that subparagraph (B)(i) focuses on step-two dis-
cretionary determinations, not threshold judgments about
eligibility. Here, too, subparagraph (B)(i) reflects our law's
longstanding distinction between "eligibility [determina-
tions under] specific statutory standards" and subsequent
decisions about whether to grant "ultimate relief" through
an "exercise of discretion." *Jay* v. *Boyd*, 351 U. S. 345, 353–
354 (1956).

Still other clues confirm that subparagraph (B)(i) targets
second-step discretionary decisions. Take the title Con-
gress chose in § 1252(a)(2)(B). It labeled this provision "De-
nials of discretionary relief." In doing so, Congress left little
doubt that subparagraph (B) and its accompanying clauses
(i) and (ii) are designed to bar review of only those decisions
invested to the Attorney General's discretion, not anteced-
ent statutory eligibility determinations.

Consider as well the statute's history. When Congress
borrows words from an established legal context, it "pre-
sumably knows and adopts the cluster of ideas that were
attached" to them. *Morissette* v. *United States*, 342 U. S.

—————————

[2] Section 1229b says the Attorney General "may, in his discretion" can-
cel removal, but only where an alien satisfies certain statutory criteria.
§§ 1229b(a), (b). Section 1229c says the Attorney General "may permit"
voluntary departure, but only if an alien meets certain legal require-
ments. §§ 1229c(a), (b). Likewise, §§ 1182(h) and 1182(i) say the Attor-
ney General "may, in his discretion," waive certain forms of inadmissi-
bility, but only for those aliens who satisfy the specified criteria.

246, 263 (1952). And that's exactly what happened here. Before Congress enacted subparagraph (B)(i), courts reviewed *both* first-step "eligibility" determinations *and* second-step "discretionary" determinations. *Foti* v. *INS*, 375 U. S. 217, 228–230, and n. 15 (1963) (holding second-step judgments reviewable "for arbitrariness and abuse of discretion"). By adding subparagraph (B)(i) in 1996, Congress clearly altered that regime. Yet Congress did so carefully. In precluding review of judgments "regarding the granting of relief," Congress used language very similar to the language this Court had long used to describe second-step discretionary determinations. See, *e.g.*, *INS* v. *Doherty*, 502 U. S. 314, 323 (1992) (distinguishing "the discretionary grant of relief" from prima facie eligibility); *id.*, at 333 (Scalia, J., concurring in judgment in part and dissenting in part) (distinguishing "the Attorney General's power to grant . . . relief" from judgments of "statutory ineligibility"); *INS* v. *Abudu*, 485 U. S. 94, 105 (1988) (distinguishing "the ultimate grant of relief" from prima facie eligibility in adjustment-of-status cases specifically); *INS* v. *Bagamasbad*, 429 U. S. 24, 26 (1976) (*per curiam*) (statute authorized "the Attorney General in his discretion to grant relief," but only "if certain eligibility requirements are met"). All of which provides still one more strong indication that Congress used the phrase "regarding the granting of relief" to target step-two discretionary decisions alone.

B

Not only does the majority ignore most of these contextual clues. Its own arguments from statutory context do more to hurt than help its cause. The majority first directs us to § 1252(a)(2)(D). That provision says that "[n]othing in subparagraph (B) or (C), or in any other provision of this chapter . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed

with an appropriate court of appeals." According to the majority, this language would make no sense and do no work unless we read subparagraph (B)(i) to bar judicial review of *any* decision under § 1255. As the majority puts it, subparagraph (D)'s directive preserving judicial review for constitutional claims and questions of law necessarily implies that "*something*" must remain unamenable to judicial review under subparagraph (B)(i). *Ante*, at 9. And the only "remaining category" that could be immune from judicial review is subparagraph (B)(i) cases involving "questions of fact" like Mr. Patel's. *Ibid.*

This argument falters almost immediately. Everyone agrees that, at the very least, subparagraph (B)(i) precludes judicial review of the Attorney General's second-step discretionary judgments "regarding the granting of relief." And everyone agrees that subparagraph (D) restores judicial review of these discretionary judgments only to the extent a legal question or constitutional claim is in play. So, for example, if the Attorney General sought to exercise his discretion to discriminate against an applicant on the basis of race, subparagraph (D) would allow judicial review despite the terms of subparagraph (B)(i). But if no legal or constitutional defect is alleged, judicial review would be impermissible. It is hardly necessary to adopt the majority's interpretation to fit these two provisions together and give each real work to do.

Even more fundamentally, the majority's argument proceeds on a mistaken assumption. On its view, subparagraph (D) must leave something unreviewable under subparagraph (B)(i) for the former to make any sense as an exception. But that takes far too blinkered a view of the statutory scheme; it is not as if these are the only two provisions in our Nation's immigration laws. By its terms, subparagraph (D) operates across a whole chapter of the U. S. Code. And in fact, subparagraph (D) undoubtedly performs *real* work as an exception with respect to other provisions

besides subparagraph (B)(i). To take just one example, this Court has already decided a case discussing subparagraph (D)'s implications for cases arising under subparagraph (C). See, *e.g.*, *Guerrero-Lasprilla* v. *Barr*, 589 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 12) (explaining subparagraph (D)'s impact on § 1252(a)(2)(C)).

The majority's argument fails for still another reason. It overlooks the "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 153 (1976). Congress enacted subparagraph (B)(i) in 1996 to address the narrow question of judicial review over administrative "denials of discretionary relief." Meanwhile, as the majority acknowledges, Congress adopted subparagraph (D) nearly a decade later and did so to address a much larger problem—the potential that *many* statutes in the INA foreclosing judicial review might be unconstitutional in certain applications. *Ante*, at 9. Congress responded to this potential problem by allowing legal and constitutional challenges under "any other provision of [an entire] chapter" of the U. S. Code. § 1252(a)(2)(D). In doing so, subparagraph (D)'s later-in-time and more general reference to "constitutional claims or questions of law" across a full chapter of the U. S. Code did nothing to disturb subparagraph (B)(i)'s targeted application to judgments "regarding the granting of relief" under § 1255. Instead, the statutes work in tandem. The majority's approach ignores this conclusion, and along with it subparagraph (B)(i)'s specific language.[3]

---

[3] There's at least one more problem here yet. The majority says subparagraph (D) preserves *constitutional* and *legal* questions for judicial review, and the majority further assumes that Mr. Patel's petition poses only a *factual* question. *Ante*, at 9. But the question Mr. Patel seeks to pose in court is whether the agency's factual determinations are ones no "reasonable adjudicator" could have adopted given the record before it.

Perhaps sensing the weakness of its main contextual argument, the majority tries another. It insists that Mr. Patel "cannot explain" why subparagraph (B)(i) should be read to allow courts to review the BIA's factual findings when subparagraph (C) prohibits courts from doing so. *Ante*, at 14. But there is no incongruity here. The two subparagraphs use different language and perform different work. Subparagraph (B)(i) only disallows judicial review of judgments "regarding the granting of relief" and covers the mine run of cases. Subparagraph (C) speaks more broadly, precluding review of "any final order of removal," and addresses specifically those aliens who are removable because of past criminal offenses. And it is hardly surprising that Congress might wish to use different language allowing greater judicial review in cases involving noncriminal aliens than in cases involving aliens who have been convicted of criminal offenses in this country.

Tellingly too, the majority's contextual arguments yield an inexplicable anomaly. On its view, subparagraph (B)(i) precludes judicial review of all adjustment-of-status applications, whether an individual seeks to challenge the agency's step-one eligibility determination or its step-two discretionary judgment. Subparagraph (D) then sweeps in to restore judicial review for legal and constitutional questions. But by its terms, subparagraph (D) applies only to "petition[s] for review filed with an appropriate court of appeals."

This feature of the law has profound consequences under

---

8 U. S. C. § 1252(b)(4)(B); see *supra*, at 6. The majority never explains why that question is something other than a question of law that subparagraph (D) expressly preserves for judicial review. But why wouldn't it be? Cf. *Colorado Nat. Bank* v. *Commissioner*, 305 U. S. 23, 25 (1938) ("It is settled law that a finding of fact [made by an agency] will not be disturbed on review if it is supported by substantial evidence. But whether there is substantial evidence to support a finding is a question of law").

the majority's reading of the INA. Yes, on its account, those like Mr. Patel who are subject to removal orders can still challenge at least the agency's legal and constitutional errors by petitioning for review in a federal court of appeals. But individuals frequently seek to adjust their status and secure a green card *outside* the removal context. And when the government rejects an application for adjustment of status in these cases, individuals routinely seek judicial review in *district court.* See Brief for Respondent 39; see also *Sanchez* v. *Mayorkas,* 593 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 3) (reviewing one such challenge). There, subparagraph (D) does not apply to preserve review of legal and constitutional questions. So under the majority's construction of subparagraph (B)(i), individuals who could once secure judicial review to correct administrative errors at step one in district court are now, after its decision, likely left with no avenue for judicial relief *of any kind.* An agency may err about the facts, the law, or even the Constitution and *nothing* can be done about it.

Nor is this some small sideshow. As the government, Mr. Patel, and *amici* stress, thousands of individuals seek to obtain a green card every year outside the removal context— the student hoping to remain in the country, the foreigner who marries a U. S. citizen, the skilled worker sponsored by her employer. In the last three months of 2021 alone, USCIS denied more than 13,000 green-card applications, with nearly 790,000 still pending.[4] The agency issues decisions on those applications in unpublished and terse letters, which appear to receive little or no administrative review within DHS. See Brief for National Immigration Litigation

─────────

[4] See USCIS, Number of I–485 Applications to Register Permanent Residence or Adjust Status by Category, Case Status, and USCIS Field Office of Service Center Location, October 1, 2021–December 31, 2021, https://www.uscis.gov/sites/default/files/document/reports/I485_performance data_fy2022_qtr1.pdf (May 6, 2022).

Alliance et al. as *Amici Curiae* 25. With so many applications receiving such abbreviated treatment, who can be surprised that DHS sometimes makes serious errors, or may even be tempted to take shortcuts inconsistent with the law? See *id.*, at 23–27 (documenting DHS errors). Until today, courts could correct mistakes like these. But the majority's construction of subparagraph (B)(i) will almost surely end all that and foreclose judicial review for countless law-abiding individuals whose lives may be upended by bureaucratic misfeasance.

The majority's response is hardly satisfying. The majority does not try to explain how its interpretation fits with the usual presumption of judicial reviewability of administrative actions—a presumption it claims to endorse and no party before us questions. *Ante*, at 17. Instead, the majority muses that denying green-card applicants any ability to seek judicial review might be "consistent with Congress' choice to reduce procedural protections in the context of discretionary relief." *Ante*, at 16. But a hunch about unexpressed legislative intentions is no response to our usual presumption of judicial review. Nor is it any answer to the mountain of textual and contextual evidence suggesting that Congress limited judicial review *only* with respect to second-step discretionary decisions, not decisions about statutory eligibility.

Just look, too, at all the guesswork lurking behind the majority's hunch. The majority's argument first depends on a hypothesis that Congress intentionally designed a scheme that encourages individuals who receive erroneous rulings on their green-card applications to overstay their visas and remain in this country unlawfully. Next, it depends on a second-level hypothesis that Congress replaced a presumptive promise of judicial review with a scheme in which judicial review depends on the happenstance of a governmental decision to seek removal. Finally, the majority's position relies on a third supposition—that Congress might

have withdrawn judicial review for thousands upon thousands of lawfully present persons annually, and done so without expressly discussing the question. Often this Court rejects as implausible statutory interpretations that seek to squeeze elephants into mouseholes. See, *e.g.*, *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001). Today's interpretation seeks to cram a veritable legislative zoo into one clause of one subparagraph of one subsection of our Nation's vast immigration laws.

\*

The majority concludes that courts are powerless to correct an agency decision holding an individual ineligible for relief from removal based on a factual error, no matter how egregious the error might be. The majority's interpretation has the further consequence of denying *any* chance to correct agency errors in processing green-card applications outside the removal context. Even the government cannot bring itself to endorse the majority's arresting conclusions. For good reason. Those conclusions are at war with all the evidence before us. They read language out of the statute and collapse the law's clear two-step framework. They disregard the lessons of neighboring provisions and even ignore the statute's very title. They make no sense of the statute's history. Altogether, the majority's novel expansion of a narrow statutory exception winds up swallowing the law's general rule guaranteeing individuals the chance to seek judicial review to correct obvious bureaucratic missteps. It is a conclusion that turns an agency once accountable to the rule of law into an authority unto itself. Perhaps some would welcome a world like that. But it is hardly the world Congress ordained.