**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NAGENDRA KUMAR NAKKA;
NITHEESHA NAKKA; SRINIVAS
THODUPUNURI; RAVI VATHSAL
THODUPUNURI; RAJESHWAR
ADDAGATLA; VISHAL
ADDAGATLA; SATYA VENU
BATTULA; SANDEEP BATTULA;
SIVA PEDDADA; PAVANI
PEDDADA; VENKATA PEDDADA;
ABIGAIL EDWARDS; MIRIAM
EDWARDS-BUDZADZIJA,
individually and on behalf of all others
similarly situated,

     *Plaintiffs-Appellants*,

  v.

UNITED STATES CITIZENSHIP
AND IMMIGRATION SERVICES;
UNITED STATES DEPARTMENT
OF STATE,

     *Defendants-Appellees*.

No. 22-35203

D.C. No. 3:19-cv-
02099-YY

OPINION

Appeal from the United States District Court
for the District of Oregon
Youlee Yim You, Magistrate Judge, Presiding

Argued and Submitted February 7, 2023
Portland, Oregon

Filed August 6, 2024

Before:  Milan D. Smith, Jr., Danielle J. Forrest, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Sung;
Concurrence by Judge Forrest

## SUMMARY[*]

### Immigration

In an action in which Plaintiffs challenged certain immigration policies in district court, the panel vacated the district court's order granting Defendants' motion to dismiss for failure to state a claim, and remanded, holding that the district court lacked jurisdiction over most of Plaintiffs' claims because they were not ripe.

Plaintiffs in this putative class action are Indian nationals, who have long resided in the United States on nonimmigrant work visas, and their children, who are derivative beneficiaries of their parents' visas. Plaintiffs seek to adjust their status to permanent resident, and challenged certain generally applicable policies that Defendants—U.S. Citizenship and Immigration Services

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

("USCIS") and the U.S. Department of State—use to determine eligibility of derivative beneficiaries.

The Government argued that the plain language of 8 U.S.C. § 1252(a)(2)(B)(i), which limits federal court review of certain forms of discretionary immigration relief—including adjustment of status—combined with the rationale of *Patel v. Garland*, 596 U.S. 328 (2022), compel the conclusion that § 1252(a)(2)(B)(i) strips federal courts of jurisdiction over Plaintiffs' claims. The panel disagreed, concluding that § 1252(a)(2)(B)(i) does preclude review of the denial of an enumerated form of relief (i.e, the denial of adjustment of status), but does not strip federal district courts of jurisdiction to hear Plaintiffs' collateral challenges to generally applicable policies and procedures.

However, the panel concluded that—with the exception of one Plaintiff—Plaintiffs' claims are not ripe because Plaintiffs have not applied for adjustment of status, and USCIS has not denied their applications based on the challenged policies. Following Supreme Court precedent, the panel explained that Plaintiffs' claims would ripen only once they took the affirmative step of applying and having their path blocked by the challenged policies.

As to one Plaintiff, Peddada, who did apply for adjustment of status and whose application USCIS denied, the panel concluded that she could establish ripeness. However, the panel concluded that §§ 1252(a)(2)(B)(i) and (D) (allowing limited review of questions of law and constitutional claims raised in a petition for review of an order of removal) channel review of her legal and constitutional challenges into a petition for review from a final order of removal. The panel recognized that individuals like Peddada—who have not violated any

immigration laws— must violate the law to render themselves removable in order to obtain judicial review.

Finally, the panel noted that its interpretation of § 1252(a)(2)(B)(i)'s scope is consistent with opinions with the court's sister circuits.

Concurring in part and concurring in the judgment, Judge Forrest agreed with the majority in its ripeness determinations and its conclusion that §§ 1252(a)(2)(B)(i) and (D) channel Peddada's claims through this court to a petition for review. However, Judge Forrest concluded that there was no cause in this case to address whether § 1252(a)(2)(B)(i) strips jurisdiction over general challenges to USCIS's policies and practices. Judge Forrest explained that, because USCIS made an individualized determination on Peddada's application and applied the challenged policies and practices directly to her, she can no longer be deemed to assert any truly collateral claims.

**COUNSEL**

Brent W. Renison (argued), Parrilli Renison LLC, Portland, Oregon, for Plaintiffs-Appellants.

Victor M. Mercado-Santana (argued), Trial Attorney, Civil Division, Office of Immigration Litigation; Samuel P. Go, Assistant Director; William C. Peachey, Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division; United States Department of Justice; for Defendants-Appellees.

Laura K. McNally and Nicole A. Tavers, Loeb & Loeb LLP, La Grange, Illinois; Peter S. Margulies, Roger Williams

University School of Law, Bristol, Rhode Island; for Amicus Curiae Immigration Law Professors.

Matt Adams, Glenda M. Aldana Madrid, Leila Kang, and Aaron Korthuis, Northwest Immigrant Rights Project, Seattle, Washington; Mary A. Kenney and Kristin Macleod-Ball, National Immigration Litigation Alliance, Brookline, Massachusetts; for Amici Curiae National Immigration Litigation Alliance and Northwest Immigrant Rights Project.

**OPINION**

SUNG, Circuit Judge:

Plaintiffs in this putative class action are Indian nationals, who have long resided in the United States on nonimmigrant work visas, and their children, who are derivative beneficiaries of their parents' visas. Plaintiffs seek to adjust their status to permanent resident through employment-based immigrant visas, and their operative complaint challenges certain generally applicable policies that Defendants—U.S. Citizenship and Immigration Services ("USCIS") and the U.S. Department of State ("DOS")—use to determine whether dependent children have "aged out" of eligibility to adjust their status as derivative beneficiaries of their parents. Plaintiffs claim that the challenged policies violate the Equal Protection guarantee of the federal constitution and the Administrative Procedure Act ("APA").

The district court granted Defendants' motion to dismiss Plaintiffs' complaint for failure to state a claim, with leave to amend. Instead of amending their complaint, Plaintiffs

filed this appeal. While this case was pending, the Supreme Court decided *Patel v. Garland*, 596 U.S. 328 (2022), which held that, under 8 U.S.C. § 1252(a)(2)(B)(i), "[f]ederal courts lack jurisdiction to review facts found as part of discretionary-relief proceedings under § 1255 and the other provisions enumerated in § 1252(a)(2)(B)(i)." 596 U.S. at 347. Defendants' principal argument here is that § 1252(a)(2)(B)(i), as interpreted in *Patel*, also strips federal courts of subject matter jurisdiction to hear Plaintiffs' challenges to USCIS and DOS policies.

We conclude that this case must be dismissed because we lack constitutional and statutory jurisdiction over Plaintiffs' claims challenging Defendants' policies. We disagree with the Government that the "plain language of the statute and the rationale of *Patel*" compel the conclusion that § 1252(a)(2)(B)(i) strips federal courts of jurisdiction over Plaintiffs' claims. Rather, we conclude that § 1252(a)(2)(B)(i) does not categorically strip federal district courts of jurisdiction to hear Plaintiffs' claims, which challenge generally applicable agency policies without referring to or relying on denials of individual applications for relief. However, we conclude that most of the named plaintiffs' claims are not ripe because they have not applied for adjustment of status and USCIS has not denied their applications based on the challenged policies. One named plaintiff did apply for adjustment of status, and USCIS denied her application based on the challenged policies. Although she can rely on that denial to establish ripeness, we agree with the Government that § 1252(a)(2)(B)(i) and (D) channel review of her legal and constitutional challenges to that denial into a petition for review from a final order of removal. Accordingly, we vacate the district court order and remand with instructions to dismiss for lack of jurisdiction.

## I. BACKGROUND

The named plaintiffs are Indian nationals and their dependent children who seek to adjust their status to lawful permanent resident. Plaintiff parents came to the United States on employment-based nonimmigrant visas, which grant them lawful status for a temporary period. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b) (describing the so-called H-1B nonimmigrant visa status). Plaintiff children entered the country with their parents in a lawful derivative nonimmigrant status. *See* 8 C.F.R. § 214.1(a)(1)(iii), (a)(2) (describing the H-4 derivative nonimmigrant status for dependents of H-1B visa holders).

Plaintiff parents' employers subsequently petitioned USCIS for immigrant visa classification for Plaintiff parents. *See* 8 U.S.C. § 1153(b) (describing employment-based immigrant visa categories); *see also Zixiang Li v. Kerry*, 710 F.3d 995, 997–98 (9th Cir. 2013) (summarizing petition process). Plaintiff parents included their children as derivative beneficiaries on these petitions. With approved petitions, Plaintiff parents and children are eligible to receive an immigrant visa and apply for "adjustment" of their nonimmigrant status to that of lawful permanent residents. *See Babaria v. Blinken*, 87 F.4th 963, 972 (9th Cir. 2023) (explaining adjustment of status and the statutory criteria for adjustment under 8 U.S.C. § 1255).

Individuals with approved petitions must wait for an immigrant visa to become available before USCIS will allow them to apply for adjustment. 8 U.S.C. § 1255(a) (requiring "an immigrant visa [be] immediately available" before an adjustment application is filed). Generally, employment-based immigrant visas become available in the order in which visa petitions are filed. 8 U.S.C. § 1153(e)(1). But

because visa demand exceeds annual statutory caps on the number of visas that USCIS may issue, visa availability is also subject to a formula that incorporates several "interrelated factors," including: (1) the "preference category" or type of visa issued, and (2) the applicant's country of birth, also known as the country of "charge[ability]." *Babaria*, 87 F.4th at 972–74 (explaining numerical limitations and relevant factors).[1] DOS tracks visa availability by means of a monthly "Visa Bulletin," which lays out—by preference category and country—when immigrant visas are expected to become available to applicants. *See* 8 C.F.R. § 245.1(g)(1). Here, Plaintiffs' visas are all chargeable to India. Historically, large numbers of Indian nationals have applied for immigrant visas, and consequently, visa wait times for Indians have lasted years—if not decades, often exceeding wait times for other foreign nationals. *See Babaria*, 87 F.4th at 973–75 (explaining how this issue impacts Indian applicants). Plaintiffs' individual cases are no exception.

These long wait times create a potential problem for Plaintiff children, who seek to adjust their status as the derivative "child[ren]" of individuals "entitled to [] immigrant status." 8 U.S.C. § 1153(d). Section 1101(b)(1) defines "child" as an "unmarried person under twenty-one years of age." Because Plaintiffs have waited years for visas to become available, Plaintiff children are at risk of losing their derivative status by turning 21 and "aging out." *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 45 (2014) (plurality opinion) (explaining the aging-out problem).

---

[1] With limited exceptions, immigrant visas for a given category are "charged" to the country of the beneficiary's birth. 8 U.S.C. § 1152(b).

To address the aging-out problem faced by Plaintiff children and others similarly situated, Congress passed the Child Status Protection Act ("CSPA"), Pub. L. No. 107–208, 116 Stat. 927 (2002). CSPA provides a formula that partially tolls a child's age for immigration purposes. The statute states that:

> a determination of whether an alien satisfies the age requirement [at § 1101(b)(1), the statutory definition of "child"] . . . shall be made using–
>
> (A) the age of the alien on the date on which an immigrant visa number becomes available for such alien (or, in the case of subsection (d), the date on which an immigrant visa number became available for the alien's parent), but only if the alien has sought to acquire the status of an alien lawfully admitted for permanent residence within one year of such availability; reduced by
>
> (B) the number of days in the period during which the applicable petition described in paragraph (2) was pending.

8 U.S.C. § 1153(h)(1). In other words, a child applicant's "CSPA age is calculated by subtracting the number of days the petition on which the applicant seeks to adjust status was pending (pending time) from the applicant's age on the date the immigrant visa becomes available to the applicant (age at time of visa availability)." 7 USCIS Policy Manual, ch. 7, pt. F(2). Thus, the date on which an immigrant visa becomes available to an applicant affects their CSPA age.

Over time, USCIS has adopted different methods for determining when an immigrant visa becomes available to an applicant. At issue in this case is the method the agency employed beginning in 2018. *See* USCIS, *Policy Alert: Child Status Protection Act*, No. PA-2018-05 (May 23, 2018) (hereinafter "2018 USCIS CSPA Policy") (modifying the USCIS Policy Manual and explaining how USCIS calculates CSPA age using the DOS Visa Bulletin).[2]

## II. PROCEDURAL HISTORY

Plaintiffs filed a putative class action against USCIS and DOS in district court, challenging the policies that Defendants use to determine immigrant visa availability and CSPA age. First, Plaintiffs claim that Defendants' use of the national origin-based Visa Bulletin chart to determine applicants' ages for CSPA purposes violates equal protection. Plaintiffs contend that use of national origin classifications in the Visa Bulletin "lacks a rational basis and cannot be justified by a legitimate government interest." Second, Plaintiffs challenge the 2018 USCIS CSPA Policy[3]

---

[2] This case was initially filed challenging the 2018 USCIS CSPA Policy. USCIS modified this policy after oral argument. *See* USCIS, *Policy Alert: Age Calculation under Child Status Protection Act*, No. PA-2023-02 (Feb. 14, 2023) (describing changes to 2018 USCIS CSPA Policy). The parties dispute whether the change moots Plaintiffs' claims. Because we hold the district court lacked jurisdiction to hear Plaintiffs' case on a different ground, we do not address mootness.

[3] Plaintiffs also challenge "the Department of State's Foreign Affairs Manual, at 9 FAM 502.1-1(D)(4) Calculation of CSPA Age for Preference Categories and Derivative Petitions, with a revision date of July 29, 2019." Because we do not address the merits of Plaintiffs' challenge, and Plaintiffs appear to challenge the same policy in two different agency documents, we simply refer to the 2018 USCIS CSPA Policy.

as arbitrary and capricious under the APA. Plaintiffs also argue that Defendants violated the APA by adopting the 2018 policy without engaging in a formal rulemaking process.[4]

Defendants moved to dismiss Plaintiffs' second amended complaint (SAC) for lack of subject matter jurisdiction (arguing Plaintiffs' claims were not ripe) and for failure to state a claim. The district court adopted the magistrate judge's recommendation that both claims be dismissed for failure to state a claim and dismissed the SAC without prejudice after Plaintiffs did not seek to amend within 14 days of the order adopting the findings and recommendations. Plaintiffs then filed the instant appeal.

While this appeal was pending, the Supreme Court decided *Patel v. Garland*, 596 U.S. 328 (2022). On appeal, Defendants argued for the first time in their Answering Brief that under *Patel*'s interpretation of 8 U.S.C. § 1252(a)(2)(B)(i), federal courts lack jurisdiction to hear this case. Following oral argument, we ordered supplemental briefing on the § 1252(a)(2)(B)(i) jurisdictional issue and invited participation by *amici*.[5]

## III.  ANALYSIS

### A

Title 8, section 1252, titled "Judicial review of orders of removal," provides the statutory scheme that delineates

---

[4] Although these appear to be two separate APA claims—one arbitrary and capricious claim and one rulemaking claim—they are styled as a single "Second Claim for Relief."

[5] We have considered the arguments raised by *amici*, but for simplicity, we refer to these jointly as arguments raised by "Plaintiffs."

federal court jurisdiction in most immigration cases. Section 1252(a)(2) identifies certain "[m]atters not subject to judicial review." As relevant here, § 1252(a)(2)(B) states:

> **(B) Denials of discretionary relief**
>
> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review--
>
> > (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> >
> > (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

Subsection (B)(i) cross references various forms of discretionary relief available to qualifying noncitizens, including: (1) certain waivers of inadmissibility (§ 1182(h) and (i)); (2) cancellation of removal (§ 1229b); (3) voluntary departure (§ 1229c); and (4) adjustment of status (§ 1255).

When interpreting similar jurisdiction-stripping provisions of the immigration statutory scheme, the Supreme Court has long distinguished between the "direct review of individual denials" of applications and "general collateral challenges to [unlawful] practices and policies."

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (hereinafter "*CSS*") (distinguishing between challenges to "the denial of any individual application" and challenges to the "legality of a regulation").

Generally, Plaintiffs' claims here, like those at issue in *McNary* and *CSS*, challenge "the legality of [agency policies] without referring to or relying on the denial of any individual application." *CSS*, 509 U.S. at 56. The Government contends that § 1252(a)(2)(B)(i) strips jurisdiction over Plaintiffs' claims because it precludes review of both individual application denials and general collateral challenges to agency policies. For the following reasons, we conclude that § 1252(a)(2)(B)(i) strips jurisdiction over the former, but not the latter.

**1**

Because the Government primarily argues that *Patel* compels the conclusion that the scope of § 1252(a)(2)(B)(i) includes collateral policy claims, we begin by explaining why we disagree with the Government's reading of *Patel*.

In *Patel*, the only issue presented was whether, on Patel's petition for review of a final removal order, § 1252(a)(2)(B)(i) stripped the court of appeals of jurisdiction to review factual findings made by the immigration judge ("IJ"). 596 U.S. at 333–36. The IJ had denied Patel's application for adjustment of status based on these factual findings and issued a removal order. *Id.* at 334–35. Before the Court, the parties advanced three different interpretations of § 1252(a)(2)(B)(i): Patel argued that the statute precluded review of only the ultimate decision to deny adjustment of status, not subsidiary decisions regarding the applicant's eligibility to be considered for adjustment of

status. *Id.* at 338. The Government advanced a slightly different interpretation, arguing that the statute precluded review of all discretionary decisions (ultimate and subsidiary). *Id.* at 337–38. And the Court-appointed *amicus* argued that the statute precluded review of the ultimate and subsidiary decisions, whether discretionary or not— including factual findings. *Id.* at 337.

Considering the statutory text, the Court interpreted the term "any judgment" to mean "judgments 'of whatever kind' under § 1255, not just discretionary judgments or the last-in-time judgment." *Id.* at 338 (quotation omitted). The Court also interpreted the term "regarding" to mean "relating to." *Id.* at 338–39. This meant that "§ 1252(a)(2)(B)(i) encompasses not just 'the granting of relief' but also any judgment *relating to* the granting of relief," which "plainly includes factual findings." *Id.* at 339 (emphasis in original). Further, the Court noted that § 1252(a)(2)(D) "preserves [judicial] review of constitutional claims and questions of law" upon a petition for review and reasoned that, because Congress made such legal questions an exception to § 1252(a)(2)(B), "it must have left *something* within the rule," which would be questions of fact. *Id.* (emphasis in original).

Significantly, *all* the types of "judgments" that the *Patel* Court considered and ultimately concluded are encompassed by § 1252(a)(2)(B)(i) are judgments that an agency adjudicator makes when deciding whether to grant or deny an individual application for discretionary relief. *Patel* did not involve a collateral challenge to generally applicable agency policy or procedure. Thus, although *Patel* makes clear that § 1252(a)(2)(B)(i) covers every type of "judgment" an adjudicator makes when deciding whether to grant an individual application, the Court neither considered

nor decided whether it also encompasses generally applicable agency policies and procedures.

Further, in *Patel*, the Court stated that § 1252(a)(2)(B)(i) means that "a noncitizen 'may not bring a factual challenge *to orders denying* discretionary relief, including . . . adjustment of status.'" *Id.* at 340 (quoting *Nasrallah v. Barr*, 590 U.S. 573, 586 (2020)) (emphasis added). And the Court concluded its opinion by stating that "[f]ederal courts lack jurisdiction to review facts found as part of discretionary-relief proceedings under § 1255 and the other provisions enumerated in § 1252(a)(2)(B)(i)." *Id.* at 347. While those descriptions of § 1252(a)(2)(B)(i) make clear that it limits review when an individual challenges an order denying their application for discretionary relief, they say nothing about district court jurisdiction to review collateral challenges to generally applicable agency policies and procedures.

Because *Patel* did not decide the statutory interpretation issue presented here, we turn to the statutory text.

## 2

In *McNary* and *CSS*, the Court interpreted comparable statutes and concluded that they strip jurisdiction over denials of individual applications for relief, but not "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *McNary*, 498 U.S. at 492. In *McNary*, the Court interpreted 8 U.S.C. § 1160(e), which provided that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection." § 1160(e)(1) (emphasis omitted); *see McNary*, 498 U.S. at 491–92.

The *McNary* Court concluded that § 1160(e)(1) did not strip district court jurisdiction over general policy claims based on several aspects of the statutory text and context. First, the term "'a determination' describe[d] a single act [and not] a group of decisions or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 491–92. Second, the reference to "judicial review of *such a denial*" in § 1160(e)(3) "ma[de] clear that the earlier reference to 'a determination respecting an application' describe[d] the denial of an individual application." *Id.* at 492 (emphasis in original). Third, a related provision, § 1160(e)(3)(B), limited judicial review to the administrative record, which "incorporate[d] an assumption that the limited review provisions of [§ 1160] appl[ied] only to claims that have been subjected to administrative consideration and that have resulted in the creation of an adequate administrative record." *Id.* at 493. And fourth, the Court noted that, if Congress had "intended [§ 1160(e)] to encompass challenges to [broader] procedures and practices, it could easily have used broader statutory language," but it did not. *Id.* at 494 (contrasting the text of § 1160(e)(1) with "the more expansive language" in § 1329 and 38 U.S.C. § 211(a)).[6]

Although § 1252(a)(2)(B)(i) is not identical to the statutes that the Court considered in *McNary* and *CSS*, its text and context are similar in key respects. First, the reference to "the granting of relief under [the enumerated sections]" more likely describes a single act of granting or denying an individual application for relief.  Although the

---

[6] In *CSS*, the Court considered a similar jurisdiction-stripping statute, § 1255a(f)(1), and affirmed *McNary*'s statutory interpretation. *CSS*, 509 U.S. at 55–56.

statutory text is not a beacon of clarity, a policy or procedure would not typically "grant" relief without case-specific adjudication. Second and similarly, the heading of § 1252(a)(2)(B), which refers to "[d]enials of discretionary relief," suggests that § 1252(a)(2)(B)(i)'s reference to "any judgment regarding the granting of relief" refers to the adjudication of individual applications for relief. Third, the statutory scheme strips district court jurisdiction to review such denials (§ 1252(a)(2)(B)), channels review to the circuit courts (§ 1252(a)(2)(B), (D)), and limits judicial review to the administrative record (§ 1252(b)(4)(A)). Like the schemes considered in *McNary* and *CSS*, this scheme incorporates the assumption that there will be an administrative record of the judgment regarding the granting of relief.

Fourth, Congress could have used broader language to encompass collateral policy and procedure claims, but it did not. *Cf. McNary*, 498 U.S. at 494 (finding § 1160(e)'s text lacked broad language found in comparators). Indeed, the absence of broader language is even more significant here than in *McNary*, because when Congress enacted § 1252(a)(2)(B)(i) in 1996,[7] it "was legislating against the backdrop of recent Supreme Court law," namely, *McNary. See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1034 (9th Cir. 2016). As we recognized in *J.E.F.M.*, the *McNary* Court provided Congress with a "blueprint for how [to] draft a jurisdiction-channeling statute that would cover not only individual challenges to agency decisions, but also broader challenges to agency policies and practices." *Id.* Specifically, the Court explained that Congress could preclude review of challenges

---

[7] *See* Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") § 306, Pub. L. No. 104–208, 110 Stat. 3546 (1996).

to agency policies and practices by expressly "channeling into the [statute's] special review procedures 'all causes . . . arising under any of the provisions' of the . . . program [at issue]," or "referring to review 'on all questions of law and fact' under the . . . program." *McNary*, 498 U.S. at 494. Thus, in *J.E.F.M.*, we concluded that another jurisdiction-stripping provision enacted in 1996, § 1252(b)(9), covered challenges to practices and policies in part because its broad text "neatly track[ed] the policy and practice jurisdiction-channeling language suggested in *McNary*." *J.E.F.M.*, 837 F.3d at 1035.**[8]**

But Congress did not follow the *McNary* blueprint when it drafted § 1252(a)(2)(B)(i). Nor did Congress follow the *McNary* blueprint when it amended § 1252(a)(2)(B) in 2005. *See* REAL ID Act of 2005 §§ 101, 106, Pub. L. No. 109–13, 119 Stat. 231 (2005). Thus, Congress has clearly indicated that it did not intend § 1252(a)(2)(B)(i) to preclude district court jurisdiction over collateral policy and procedure claims.

Fifth, Congress did not explicitly strip jurisdiction over policy and procedure claims in § 1252(a)(2)(B)(i), even though it did so in § 1252(a)(2)(A)(iv), which was enacted at the same time as the current version of § 1252(a)(2)(B)(i). *See* 8 U.S.C. § 1252(a)(2)(A)(iv) ("[N]o court shall have jurisdiction to review . . . procedures and policies adopted by the Attorney General to implement the provisions of section

---

[8] Section 1252(b)(9), the statutory provision at issue in *J.E.F.M.*, states: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order[.]"

1225(b)(1) of this title."); *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1153–55 (9th Cir. 2022) (describing the operation of § 1252(a)(2)(A)); IIRIRA § 306 (enacting § 1252(a)(2)(A)(iv)). Because Congress explicitly stripped jurisdiction to review agency policy policies and procedures in § 1252(a)(2)(A)(iv) but not in § 1252(a)(2)(B)(i), we presume that Congress did not intend for the latter provision to preclude review of agency policies and procedures. *Nken v. Holder*, 556 U.S. 418, 430 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 (1987))).

Finally, Congress's use of the term "judgment" is additional, albeit weaker, textual evidence that it intended § 1252(a)(2)(B)(i) to encompass decisions the agency makes when adjudicating an individual application for relief—but not generally applicable policies or procedures. In *Patel*, the Court approvingly cited two dictionary definitions of "judgment": (1) Webster's Third New International Dictionary 1223 (1993), which defines "judgment" as "a formal utterance or pronouncing of an authoritative opinion after judging," or "an opinion so pronounced"; and (2) the Oxford English Dictionary 294 (2d ed. 1989), which defines "judgment" as "[t]he pronouncing of a deliberate opinion upon a person or thing, or the opinion pronounced." *See* 596 U.S. at 337–38.[9] Although these definitions are also

---

[9] *See also* Brief for Court-Appointed Amicus Curiae at 23, *Patel v. Garland*, 596 U.S. 328 (2022) (No. 20-979), 2021 WL 4942180 at *23 (referring to judgment as the "act of determining, as in courts, what is conformable to law and justice").

somewhat ambiguous, they at least suggest "judgment" refers to a decision that is made when an adjudicator, for example, applies law to particular facts—that is, when an agency processes a particular person's application for relief—and not to broad agency policies or procedures.[10]

We are further persuaded that "judgment" refers to a decision in an individual case by the language in § 1252(a)(2)(B), which lists three terms— "judgment, decision, or action." There are two possible ways to interpret this list: (1) these terms are interchangeable, or (2) each term means something different. In this context, each term must mean something different because Congress used the terms differently in § 1252(a)(2)(B)(i) and (ii), and we must read clause (i) and clause (ii) "harmoniously." *Kucana v. Holder*, 558 U.S. 233, 246–47 (2010). *Compare* § 1252(a)(2)(B)(i) ("any judgment regarding the granting of relief"), *with* § 1252(a)(2)(B)(ii) ("any other decision or action of the Attorney General or the Secretary of Homeland Security").

Our conclusion that "judgment" in clause (i) means something different from "other decision or action" in clause (ii) is consistent with the Court's interpretations of § 1252(a)(2)(B) in *Kucana* and *Patel.* In *Kucana*, the Court held that clause (i) "enumerat[es] . . . administrative judgments that are insulated from judicial review" whereas

---

[10] Other statutory provisions relied on by *Patel* also confirm that the scope of § 1252(a)(2)(B)(i) is limited to judgments made in adjudicatory proceedings. For example, the Court noted that "[t]he Government bears the burden of proving removability by clear and convincing evidence, while an applicant bears the burden of establishing eligibility for discretionary relief." *Id.* at 345 (citing 8 U.S.C. § 1229a(c)(3)(A) and (4)(A)). The Government and an "applicant" only bear these burdens when the agency is adjudicating an individual's application for relief—not when plaintiffs challenge generally applicable policies or procedures.

"clause (ii) [is] a catchall provision covering 'any other decision [or action].'" 558 U.S. at 246 (quoting § 1252(a)(2)(B)(i) & (ii)). Further, while the Court explained that the three terms "are of a like kind," it also indicated that "judgment" is a "specific" term, and "decision" is a "general term." *Id.* at 247–48 (citing *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008)). And in *Patel*, the Court noted that "judgment" is defined as an "authoritative decision." 596 U.S. at 337–38.

Together, *Kucana*, *Patel*, and the statutory text compel the conclusion that "judgment" is a specific type of decision and that there are other types of decisions that are not "judgments." Thus, we conclude that "any judgment regarding the granting of relief" refers to the authoritative decisions an agency makes when adjudicating an individual application for discretionary relief. And "other decision or action" more broadly includes other types of agency decisions—including those that may not qualify as "judgments."[11]

### 3

The Government argues for a maximalist interpretation of § 1252(a)(2)(B)(i). In its view, clause (i) encompasses any

---

[11] The dictionary definitions of "decision" and "action" further support this conclusion, because those terms are defined more broadly than "judgment." *See, e.g.*, Webster's Third New International Dictionary 585 (1993) (defining "decision" as "a determination arrived at after consideration"); 4 Oxford English Dictionary 332 (2d ed. 1989) (defining "decision" as "[t]he final and definite result of examining a question"); Webster's Third New International Dictionary 21 (1993) (defining "action" as "an act or decision by an executive or legislative body"); 1 Oxford English Dictionary 127 (2d ed. 1989) (defining "action" as "[t]he process or condition of acting or doing (in the widest sense)").

type of agency action—both judgments made in individual cases and generally applicable policies and procedures—related to the enumerated forms of discretionary relief, without limit. But the Government's arguments for this broad reading are unpersuasive.

The Government points to the "regardless" clause of § 1252(a)(2)(B), which states, in relevant part: "Notwithstanding any other provision of law . . . and *regardless of whether the judgment, decision, or action is made in removal proceedings*, no court shall have jurisdiction to review" the judgments, decisions, and actions specified in clauses (i) and (ii). (Emphasis added.) The Government argues that interpreting § 1252(a)(2)(B)(i)'s reference to "any judgment regarding the granting of relief" as encompassing only judgments that the agency makes in granting or denying an individual application for relief would render the "regardless" clause meaningless.

But the Government is incorrect. USCIS and the Department of Homeland Security ("DHS") grant or deny individual applications for discretionary relief—and therefore make judgments in adjudicating those applications—outside "removal proceedings" in at least three different circumstances.

First, when an individual who is lawfully present in the United States pursuant to a valid visa applies for adjustment of status under § 1255, that individual is not in removal proceedings. That necessarily means that when USCIS renders a "judgment" in deciding whether to grant or deny

that individual's application for adjustment of status, that judgment occurs outside "removal proceedings."[12]

Second, when an individual is removable, but the government has not yet initiated removal proceedings against them, they may ask DHS to grant them voluntary departure "in lieu of being subject to [removal] proceedings." *See* 8 U.S.C. § 1229c(a). Although an IJ may grant voluntary departure when an individual is *in* removal proceedings, *see, e.g.*, 8 U.S.C. § 1229c(b), only DHS may grant voluntary departure when the individual is not yet in (and is therefore outside) removal proceedings, *see* 8 C.F.R. § 240.25(a) (authorizing designated DHS officials to grant voluntary departure before the start of proceedings).

Third, other forms of relief can be granted only by USCIS or DHS, not an IJ, outside removal proceedings. For example, only USCIS or DHS can grant relief to arriving aliens[13] who are in removal proceedings. *See* 8 C.F.R.

---

[12] Plaintiffs also argue that the statutory reference to "relief under section . . . 1255" does not include adjustment of status applications filed by individuals who are lawfully present, because those individuals are not subject to removal, and therefore, they are not applying for "relief from removal." We address that argument below.

[13] Arriving aliens are defined as "applicant[s] for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. They remain "arriving aliens" even after they are allowed to entry on a temporary parole. *Id.* USCIS has jurisdiction to consider the application of an arriving alien, even when they are in removal proceedings. 8 C.F.R. §§ 1245.2(a)(1)(i), (ii), 245.2(a)(1). In such situations, the arriving alien may ask an IJ for a continuance while USCIS adjudicates their application. *See, e.g.*, *Singh v. Holder*, 771 F.3d 647, 653 (9th Cir. 2014) (holding that the Board of Immigration Appeals has authority to reopen an arriving alien's case so he could apply for

§ 1245.2(a)(1)(i), (ii); *see also Kalilu v. Mukasey*, 548 F.3d 1215, 1217–18 (9th Cir. 2008) (observing that even when arriving aliens are in removal proceedings, they must file their adjustment application with USCIS).**14**

Without the "regardless" clause, § 1252(a)(2)(B)(i) could be interpreted as encompassing only judgments regarding the granting of discretionary relief that are made by an IJ in removal proceedings. But, because of the "regardless" clause, § 1252(a)(2)(B)(i) must be interpreted as also encompassing judgments regarding the granting of discretionary relief that are made by USCIS and DHS outside removal proceedings. And the "regardless" clause serves that purpose, even if § 1252(a)(2)(B)(i) encompasses only the judgments made by an IJ, USCIS, or DHS when deciding whether to grant an individual application for relief.

The Government also points to the word "regarding" in the phrase "any judgment regarding the granting of relief." *See* 8 U.S.C. § 1252(a)(2)(B)(i). And it correctly points out that *Patel* read "regarding" as having a "broadening effect" that encompasses "not only [the provision's] subject but also matters relating to that subject." *Patel*, 596 U.S. at 338–39

---

adjustment before USCIS). If the application is granted, then removal proceedings may be terminated. *See* 8 C.F.R. § 1240.12(c) (IJ may order removal "or the termination of the proceedings, or other such disposition of the case as may be appropriate").

[14] And of course, under § 1252(a)(2)(B)(ii), there are numerous other "decisions or actions" that DHS and USCIS make outside removal proceedings, which give further meaning to the "regardless" clause. *See, e.g.*, *Kucana*, 558 U.S. at 248 (enumerating various decisions or actions covered by (B)(ii), which occur outside removal proceedings); *Poursina v. USCIS*, 936 F.3d 868, 870 (9th Cir. 2019) (holding that (B)(ii) applies to certain national interest waivers, which are granted outside removal proceedings).

(quotation omitted). Because of that broadening effect, *Patel* rejected interpretations that would have narrowed § 1252(a)(2)(B)(i)'s scope to encompass only the agency's ultimate decision to deny an application for discretionary relief, or to exclude the agency's predicate factual findings. *Id. Patel*, however, did not hold that "regarding" should be construed as broadening the scope of § 1252(a)(2)(B)(i) to the furthest stretch of its indeterminacy, without limit.

The Court has repeatedly cautioned against reading terms like "relate to" or "regarding" too broadly. *See, e.g.*, *Dubin v. United States*, 599 U.S. 110, 119 (2023). As the Court explained in *Dubin*, "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as really, universally, relations stop nowhere." *Id.* (cleaned up) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). "That the phrase refers to a relationship or nexus of some kind is clear. Yet the kind of relationship required, its nature and strength, will be informed by context." *Id.* (internal citation omitted). Thus, "[i]n deciding between the parties' readings, one limited and one near limitless, precedent and prudence require a careful examination of [the statute]'s text and structure." *Id.* at 118.

Here, as in *Dubin*, careful examination of § 1252(a)(2)(B)(i)'s text and context makes clear that its scope is broad, as *Patel* held, but not limitless, as the Government now contends. As discussed above, Congress did not draft § 1252(a)(2)(B)(i) to reach as broadly as it could have. Even though Congress had the benefit of the *McNary* blueprint for encompassing collateral policy and procedure claims, and even though Congress followed that blueprint when it drafted § 1252(b)(9), Congress did not

follow the *McNary* blueprint when it drafted § 1252(a)(2)(B)(i). Rather, Congress used terms like "judgment," "the granting of relief under" specific statutes, and "denials of discretionary relief," which point towards reading § 1252(a)(2)(B)(i) as precluding review of a judgment an agency makes in the course of adjudicating an individual application for relief, but not collateral actions challenging general policies and procedures.

Thus, we conclude that § 1252(a)(2)(B)(i) does not strip district courts of jurisdiction to hear collateral challenges to Defendants' generally applicable policies and procedures. However, here, as in *CSS*, the statutory jurisdiction-stripping provision is not the only jurisdictional hurdle Plaintiffs face. Their "claims still must satisfy the jurisdictional and justiciability requirements that apply in the absence of a specific congressional directive." *CSS*, 509 U.S. at 56. We address the additional hurdles in the following section.

**B**

Where, as here, Plaintiffs request injunctive and declaratory relief from the policies of administrative agencies, courts "have been reluctant" to grant such requests "unless [they] arise in the context of a controversy 'ripe' for judicial resolution, that is to say, unless the effects of the administrative action challenged have been felt in a concrete way by the challenging parties." *CSS*, 509 U.S. at 57 (cleaned up) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). In some cases, "the promulgation of a regulation will itself affect parties concretely enough to satisfy this requirement," for example, when it "present[s] plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous

restrictions and risking serious penalties for violation." *Id.* (citations omitted).

However, the policies challenged in this case, like the regulations challenged in *CSS*, "impose no penalties for violating any newly imposed restriction, but [instead] limit access to a benefit." *Id.* at 58. Where challenged policies only limit access to an immigration benefit that is created by statute "but not automatically bestowed on eligible aliens," the promulgation of the challenged policies does not itself confer a ripe claim. *Id.* Rather, a plaintiff's "claim would ripen only once he took the affirmative steps that he could take before the [agency] blocked his path by applying the [challenged policies] to him." *Id.* at 59. "Ordinarily . . . that barrier would appear when the [agency] formally denied the [plaintiff]'s application on the ground that the [challenged policies] rendered him ineligible for [the benefit sought]." *Id.* at 60. But, when the plaintiff seeks "to rely on the denial of his application to satisfy the ripeness requirement," and the statute channels appeals from such denials into a limited review scheme, then the plaintiff "would then still find himself at least temporarily barred" by those channeling provisions. *Id.* In that case, the "ripeness doctrine and the [statute's] jurisdictional provisions would thus dovetail neatly." *Id.*

In *CSS*, the plaintiffs had not taken all possible affirmative steps before filing their complaint—meaning, they had not filed and obtained formal denials of their applications based on the challenged policies. *See id.* at 65 n.25. The plaintiffs had to obtain formal denials to establish ripeness, unless they demonstrated that their circumstances justified an exception. *Id.* at 59, 61. The Court identified at least two circumstances that would justify making an exception: first, the plaintiffs' collateral claims would be

deemed ripe if they demonstrated that the statute's "limited [review] scheme would afford them inadequate review" of their claims. *See id*. at 60–61 (citing *McNary*, 498 U.S. at 487). Second, the plaintiffs would not have to file applications to establish ripeness if they demonstrated that the agency would *informally* reject their applications at a "prefiling" stage, under an agency practice referred to as "front-desking." *Id.* at 61–62. Here, only one of the named Plaintiffs filed an application for adjustment of status. We address ripeness as it relates first to the "non-filing Plaintiffs" (Nitheesha Nakka, Ravi Thodupunuri, Vishal Addagatla, and Venkata Peddada) and then to the one filing Plaintiff (Pavani Peddada).

**1**

Most of the Plaintiffs have not submitted applications for adjustment to USCIS, but they argue that both exceptions identified in *CSS* apply. We disagree.

First, the non-filing Plaintiffs have not shown that their collateral claims challenging USCIS policies "could receive no practical judicial review within the scheme established by [§ 1252]." *Id.* at 60–61. Unlike in *McNary*, the non-filing Plaintiffs do not raise purely procedural claims concerning how their applications would be processed. *See* 498 U.S. at 487–88 (describing plaintiffs' challenge regarding their inability to submit evidence, present witnesses, obtain competent interpreters, and access recordings of their interviews). Plaintiffs' claims more closely resemble those raised in *CSS*, where the plaintiffs disputed the legality of a regulation that the agency would potentially apply to determine an applicant's eligibility for legalization. *See* 509 U.S. at 47–50, 58–59. Plaintiffs' collateral policy claims present questions of law that fall within the limited scope of

review provided for under § 1252(a)(2)(D). Further, although § 1252(a)(2)(D) does not allow for review of purely factual issues, *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 235 (2020), Plaintiffs have not identified any purely factual issues that a court would need to resolve to meaningfully review their claims.[15]

Plaintiffs assert that the agency's record on a petition for review would be inadequate for meaningful review of their claims. Considering the nature of their claims, we disagree. The administrative record would include any USCIS or DHS records related to their applications, and Plaintiffs do not identify what additional documents they would need to adjudicate their claims but could not introduce into the record—either through admission into the record of a removal hearing or judicial notice. Plaintiffs correctly note that they would need to introduce the challenged agency guidance manuals, but they do not explain why they could not file these manuals before the immigration court, or otherwise request that the IJ, or the court of appeals, take notice of the guidance. *See* 8 C.F.R. § 1003.31 (allowing parties to file documents before the immigration court); *Aguilar-Osorio v. Garland*, 991 F.3d 997, 1000 (9th Cir. 2021) (noting that IJs may take administrative notice of government records); *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013) (noting that this court may take judicial notice on a petition for review).[16]

---

[15] Plaintiffs maintain that they meet all requirements for adjustment of status and that USCIS would grant their applications but for the policies they contend are legally invalid.

[16] Additionally, we conclude that USCIS's orders denying Plaintiffs' applications based on the challenged policies, as well as Plaintiffs'

Second, the non-filing Plaintiffs have not shown that USCIS would front-desk their applications based on the challenged policies.[17] Although Plaintiffs allege that USCIS would front-desk their applications, and we normally treat all well-pleaded factual allegations in a complaint as true, "we need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014) (cleaned up). Here, we do not accept the allegations regarding front-desking because, during this litigation, Plaintiffs submitted a document to the district court showing that USCIS did not front-desk Plaintiff P. Peddada's application. Specifically, Plaintiffs filed a copy of USCIS's written decision formally denying P. Peddada's application. This decision was not a "prefiling rejection," *CSS*, 509 U.S. at 61, but a "formal[] deni[al] . . . on the ground that the [challenged policies] rendered [P. Peddada] ineligible" for adjustment of status, *id.* at 60. Additionally, the non-filing Plaintiffs allege that they are similarly situated to P. Peddada and that USCIS would apply the same policies to them. Accepting that USCIS would treat the non-filing Plaintiffs like it treated P. Peddada, we must assume that

---

claims regarding those policies, would be subject to judicial review if presented in a petition for review from a final order of removal under § 1252(a)(2)(D). *See infra*, Section III.C.

[17] Plaintiffs Addagatla and V. Peddada did not make specific front-desking allegations, but at oral argument before the district court, counsel represented that they failed to apply due to a fear of being front-desked.

USCIS would accept and process the non-filing Plaintiffs' applications.[18]

## 2

Because USCIS denied P. Peddada's application for adjustment of status based on the challenged policies, she can establish ripeness. But, as discussed above, when a plaintiff relies on the denial of her application to satisfy ripeness and the statutory scheme channels review of such denials into a limited review process, then she will "still find [herself] at least temporarily barred" from review by those channeling provisions.[19] *CSS*, 509 U.S. at 60. Plaintiffs resist this conclusion by arguing that § 1252(a)(2)(B)(i) and (D) do not channel review of the type of denial at issue here: a USCIS denial of adjustment of status sought by an individual who has lawful status and who is not subject to removal. We

---

[18] Plaintiff Abigail Edwards applied for adjustment of status and USCIS *granted* her application, notwithstanding the challenged policies. As a result, we find she cannot show any injury traceable to the policies at issue. Although the district court found that Edwards had standing because her adjustment could be rescinded, we conclude that the possibility of revocation is too speculative to confer Article III standing and establish ripeness. *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all." (cleaned up)).

[19] The district court concluded that the non-filing Plaintiffs' claims are ripe under the "firm prediction" rule. *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1436 (9th Cir. 1996). Specifically, the district court "firmly predicted" that, if the non-filing Plaintiffs submitted applications, USCIS would deny them based on the challenged policies. But even accepting that assumption, the non-filing Plaintiffs would be relying on the predicted denial of their individual applications to establish ripeness, and they would be similarly situated to P. Peddada.

address that statutory interpretation issue in the following section.

## C

Plaintiffs contend that Congress intended to strip district courts of jurisdiction to review denials of adjustment of status for applicants who are unlawfully present and removable but to preserve district court jurisdiction to review such denials for applicants who are lawfully present and not removable. Plaintiffs find evidence of such intent in Congress's use of the term "relief" in § 1252(a)(2)(B)(i). They argue that "relief" is a term of art referring only to "relief from removal" for removable individuals. Plaintiffs explain that certain immigration benefits, such as adjustment of status, are considered "relief from removal" when the applicant is removable, but a "benefit" when the applicant is lawfully present on a valid visa and has no need for relief from removal. Under Plaintiffs' interpretation, § 1252(a)(2)(B)(i) does not encompass USCIS's denial of P. Peddada's adjustment of status because she had lawful status and was not seeking "relief" from removal when she applied.

Plaintiffs recognize that § 1252(a)(2)(B)'s "regardless" clause states that its provisions apply to the judgments described in clause (i) and the decisions or actions described in clause (ii) "regardless of whether the judgment, decision, or action is made in removal proceedings." They correctly point out, however, that their interpretation does not render the "regardless" clause superfluous because individuals who are removable or in removal proceedings must apply for some forms of discretionary relief outside removal proceedings. *See supra*, Section III.A. Plaintiffs further argue that the statutory text is at least ambiguous, and that the presumption that Congress intends judicial review of

administrative action requires us to resolve any ambiguity in their favor. *See Kucana*, 558 U.S. at 251.

The Government disputes Plaintiffs' interpretation of the term "relief" and contends that it refers to an immigration benefit even when the applicant does not need "relief from removal." The Government also argues that the "regardless" clause shows that Congress intended to encompass all denials of discretionary relief, even if the applicant was not subject to removal proceedings. Finally, the Government argues that even if § 1252(a)(2)(B)(i)'s use of the term "relief" introduces ambiguity, the presumption of reviewability is not applicable here because § 1252(a)(2)(B)(i) and (D) do *not* preclude review of Plaintiffs' claims, but instead merely channel those claims into a petition for review from a final order of removal.

Both parties offer plausible interpretations based on the text of § 1252(a)(2)(B) and (B)(i). The title of § 1252, "Judicial review of orders of removal," and the section's numerous references to "orders of removal" and "removal orders" lend some support to Plaintiffs' interpretation. Additionally, Plaintiffs correctly point out that, in the immigration statutory scheme, Congress typically uses the term "relief" to refer to something that only individuals who need relief from removal would apply for. *See, e.g.*, 8 U.S.C. § 1229b(c) (referring to cancellation of removal as "relief"); 8 U.S.C. § 1229c(d)(2) (same for voluntary departure). However, in a few instances, Congress has used "relief" to refer more broadly to immigration benefits that individuals who are lawfully present could apply for. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(B)(ii) (referring to asylum applications as "the granting of relief under section 1158(a)"); 8 U.S.C. § 1101(a)(51) (referring to certain forms of "relief" under the Violence Against Women Act).

Plaintiffs also cite some statements from the legislative history of the REAL ID Act and IIRIRA that suggest Congress intended to limit judicial review only in the removal context. For example, when Congress amended § 1252(a)(2)(B) by adding the "regardless" clause, it added that language to a section entitled "PREVENTING TERRORISTS FROM *OBTAINING RELIEF FROM REMOVAL*." *See* REAL ID Act § 101(f) (emphasis added). But, in our view, the relevant legislative history is too vague and scarce to resolve the textual ambiguity one way or another. Thus, even after applying all the interpretive tools available to us, we find that the statutory text remains genuinely ambiguous.

Although we find genuine ambiguity, we disagree with Plaintiffs' argument that we can resolve it by applying the presumption favoring judicial review of administrative action. As the Government contends, that presumption does not apply because the statute does not completely bar review of USCIS and DHS denials of adjustment applications. Instead, the statute channels review of those denials into a petition for review from an order of removal. *See City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 874 (9th Cir. 2009) (Generally, "the same act that would ripen a claim would also bring the claim within the reach of the statutory bar to federal court jurisdiction, thus requiring the plaintiffs to bring their claims at the time envisioned by the statutory scheme of judicial review." (citing *CSS*, 509 U.S. at 60)). Specifically, § 1252(a)(2)(B)(i) precludes judicial review *except* as provided for under § 1252(a)(2)(D), which preserves review of legal and constitutional claims raised in a petition for review from a final order of removal. Plaintiffs apparently assume that, if USCIS or DHS denies an application for discretionary relief outside removal

proceedings, the denial order, and claims challenging policies on which the denial was based, would not be reviewable on a petition for review from a final removal order under § 1252(a)(2)(D). But the Government maintains, and we agree, that both the denial order and the policy challenges would be reviewable on a petition for review from a final removal order under § 1252(a)(2)(D), even if the agency denied relief when the petitioner had lawful status and was not in removal proceedings. *See, e.g.*, *Tovar v. Sessions*, 882 F.3d 895, 898 (9th Cir. 2018) (reviewing USCIS's denial of adjustment on CSPA grounds); *Tista v. Holder*, 722 F.3d 1122, 1124 (9th Cir. 2013) (same, where noncitizen applied for special rule cancellation and was subsequently placed in removal proceedings); *Lee v. USCIS*, 592 F.3d 612, 620 (4th Cir. 2010) (observing that pursuant to § 1252(a)(2)(D), "[t]o the extent Congress decided to permit judicial review of a constitutional or legal issue bearing upon the denial of adjustment of status, it intended for the issue to be raised to the court of appeals during removal proceedings" (emphasis omitted)).

Plaintiffs also argue that construing § 1252(a)(2)(B) as applying to non-removable applicants will, as a practical matter, render those applicants' claims completely unreviewable by any court, including circuit courts. To understand this argument, consider P. Peddada. When she applied for adjustment of status, she was lawfully present as a beneficiary of her parents' visa. When USCIS denied her application, it explained that she was "not authorized to remain in the United States" and that if she "fail[ed] to depart the United States within 33 days of the date of [the denial] USCIS may . . . commence removal proceedings against [her] with the immigration court." If P. Peddada complied by leaving, she would never be placed in removal

proceedings—in which case, she could not raise her claims in a petition for review from a final order of removal. P. Peddada could obtain review only if she "bet the farm" by violating the USCIS's directive to leave when her lawful status expired and surrendering herself for removal. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007)).

We recognize that individuals like P. Peddada—who have not violated any immigration laws—must violate the law to render themselves removable and obtain judicial review. And, "[w]e normally do not require plaintiffs to 'bet the farm' . . . by taking the violative action before testing the validity of the law, and we do not consider this a meaningful avenue of relief." *Id.* (cleaned up). However, Congress can require review in this manner by expressly limiting and channeling judicial review. *See id.* at 489–90. And, in *CSS*, the Court considered an almost identical situation. There, to obtain judicial review, the plaintiffs had to "either surrender to the INS for deportation or wait for the INS to catch [them] and commence a deportation proceeding, and then suffer a final adverse decision in that proceeding, before having an opportunity to challenge the INS's denial of [the] application in court." 509 U.S. at 55. Yet, the Court found that this statutory scheme preserved a "latent right to judicial review." *Id.* at 54.

Thus, neither the legislative history nor the presumption of reviewability resolves the textual ambiguity in this case, and we must return to the text and statutory context. Although it is a close question, because Congress, in at least a few instances, used the term "relief" to refer more broadly to immigration benefits that individuals who are lawfully present could apply for, we conclude that "relief under

section . . . 1255" refers generally to adjustment of status, whether the applicant is seeking relief from removal or not. Consequently, although P. Peddada can rely on USCIS's denial of her application for adjustment of status to show that her claims are ripe, she is still "temporarily barred" from obtaining judicial review, *CSS*, 509 U.S. at 60, and her claims are reviewable only if presented in a petition for review from a final order of removal.

**D**

Finally, we note that our interpretation of § 1252(a)(2)(B)(i)'s scope is consistent with the D.C. Circuit's. *See Make the Road New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020). In *Make the Road*, our sister circuit considered whether § 1252(a)(2)(B) stripped district court jurisdiction over challenges to generally applicable policies implementing expedited removal, *id.* at 628–31, and concluded that "Subsection B's jurisdictional bar covers . . . orders denying discretionary relief in individual cases," but not "the type of challenges to the Secretary's regulations, orders, policies, and directives" at issue, *id.* at 630–31 (citation omitted).

Our decision is also consistent with the holdings of the D.C. Circuit in *Abuzeid v. Mayorkas*, 62 F.4th 578 (D.C. Cir. 2023), and of the Seventh Circuit in *Britkovyy v. Mayorkas*, 60 F.4th 1024 (7th Cir. 2023). In these post-*Patel* cases, our sister circuits held that district courts lack jurisdiction to hear plaintiffs' challenges to USCIS's denials of their applications for adjustment of status, even though plaintiffs challenged those denials as arbitrary and capricious under the APA. *Abuzeid*, 62 F.4th at 586; *Britkovyy*, 60 F.4th at 1032. Unlike the *Nakka* plaintiffs, the *Abuzeid* and *Britkovyy* plaintiffs tried to use the APA to get district court review of

individualized USCIS denials. *See Abuzeid*, 62 F.4th at 582 (noting plaintiff "asserted that the denials of [his] applications were arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA"); *Britkovyy*, 60 F.4th at 1026 (plaintiff "argued that the [USCIS's] denial was reviewable under [the APA], and he asked the court to set aside USCIS's decision"). That is, those plaintiffs' APA claims "refer[red] to or rel[ied] on the denial of [their] individual application[s]," *CSS*, 509 U.S. at 56, and thus, they were not actually collateral policy challenges arising outside the scope of § 1252(a)(2)(B)(i). Because those cases involved only challenges to denials of individual applications, not agency policies or procedures, they are not persuasive here.

We ultimately agree with our sister circuits that § 1252(a)(2)(B)(i) strips district courts of jurisdiction to hear a plaintiff's APA claim when that claim challenges an agency's individualized denial of an application for adjustment of status. This is so even if the plaintiff-applicant had lawful status and was not seeking "relief from removal." We just reach that conclusion by a slightly different path, and without adopting the Government's limitless interpretation of § 1252(a)(2)(B)(i). Although *Abuzeid* and *Britkovyy* seemingly adopted the Government's broad reading, they did so without engaging in the careful textual analysis required under *Dubin*, and without applying the analysis that our court prescribed in *J.E.F.M.* We also note that *Abuzeid* did not consider *Make the Road*'s precedential interpretation of § 1252(a)(2)(B) as stripping district courts of jurisdiction to review individualized orders denying applications for relief—but not challenges to general policies and procedures. The D.C. Circuit's opinions in *Abuzeid* and *Make the Road* are reconcilable if *Abuzeid* is

limited to cases where the plaintiff's claim seeks review of an agency's denial of their individual application for relief and does not collaterally challenge agency policy or procedure without relying on that denial. Viewed that way, our analysis is consistent with both D.C. Circuit opinions. [20]

***

For the foregoing reasons, we conclude that the district court here lacked constitutional jurisdiction over most of Plaintiffs' claims because they are not ripe. And although P. Peddada's claims are ripe, § 1252(a)(2)(B)(i) and (D) require her to present her claims in a petition for review of a final removal order. Accordingly, we vacate the district court order and remand with instructions to dismiss this case for lack of jurisdiction.

**VACATED AND REMANDED.**[21]

---

FORREST, J., concurring in part and concurring in the judgment:

I agree with the majority that (1) plaintiffs Nitheesha Nakka, Ravi Thodupunuri, Sandeep Battula, Vishal Addagatla, and Vishal Peddada's collateral, procedural challenges to the United States Citizenship and Immigration

---

[20] Our interpretation of § 1252(a)(2)(B)(i) also does not conflict with the holdings of *Thigulla v. Jaddou*, 94 F.4th 770, 777 (8th Cir. 2024), and *Cheejati v. Blinken*, 106 F.4th 388, 397 (5th Cir. 2024), which concluded that jurisdiction was lacking over requests for injunctive relief to compel DOS and USCIS to immediately process adjustment of status applications under a different clause, § 1252(a)(2)(B)(ii).

[21] The Defendants-Appellees' motion for leave to file a response to the late-filed amicus brief is granted.

Services' (USCIS) processing of adjustment-of-status applications are not ripe and, therefore, the district court lacked Article III jurisdiction, and (2) the district court lacked statutory jurisdiction over plaintiff Pavani Peddada's claims because 8 U.S.C. §§ 1252(a)(2)(B) and (D) channel review of individualized decisions on applications for adjustment of status exclusively to this court through a petition for review from a final order of removal.[1] Where the only claims over which we have constitutional authority are not truly collateral, I would not address whether § 1252(a)(2)(B)(i) strips jurisdiction over general challenges to USCIS's policies and practices.

## I.

As the majority explains, the claims asserted by the plaintiffs who have not yet applied for an adjustment of status (non-filing plaintiffs) are not ripe. Ripeness is a justiciability requirement "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993) (hereafter *CSS*); *see also United States v. Antelope*, 395 F.3d 1128, 1132 (9th Cir. 2005) ("The constitutional component of ripeness is a jurisdictional prerequisite."). It is grounded in the principle that federal courts should not "'entangl[e] themselves in abstract disagreements.'" *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (quoting *Portman v. County of*

---

[1] As the majority notes, the district court lacked constitutional jurisdiction over the claims asserted by the one remaining named plaintiff—Abigail Edwards—who applied for and was erroneously granted an adjustment of status because she cannot establish a concrete injury based on her allegation that the agency may revoke her Lawful Permanent Resident status. Maj. Op. at 31, n.18; *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012).

*Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993); *see also Fed. Election Comm'n v. Cruz*, 563 U.S. 125, 132 (2011) ("Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but "Cases' or 'Controversies.'"). The constitutional component of the ripeness requirement "'coincides squarely with" the injury-in-fact analysis for Article III standing. *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017). Whether framed as ripeness or standing, for a federal court to have the authority to review a claim, the asserted injury must involve "'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). And where the challenged regulation, like here, "impose[s] no penalties for violating any newly imposed restrictions, but limit[s] access to a benefit," *CSS*, 509 U.S. at 58, "for ripeness to be satisfied, Plaintiffs must have taken 'the affirmative steps that [they] could take before the [agency] blocked [their] path,'" *Proyecto San Pablo v. INS*, 189 F.3d 1130, 1138 (9th Cir. 1989) (quoting *CSS*, 509 U.S. at 59).

Here, the non-filing plaintiffs have not felt the effects of USCIS's actions "in a concrete way." *CSS*, 509 U.S. at 57 (citation omitted). The USCIS has not applied its challenged policies and practices governing applications for adjustment of status to the non-filing plaintiffs because they have not applied for an adjustment of status. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 144 S.Ct. 1540, 1554 (2024) ("For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute."); *see also Bassett v. ABM Parking Serv., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018)

(holding an injury is concrete if it "'actually exists'; in other words, it is 'real and not abstract.'" (quoting *Spokeo, Inc., v. Robins*, 578 U.S. 330, 340 (2016)). Thus, we lack Article III jurisdiction over the non-filing plaintiffs' claims, *Bishop Paiute Tribe*, 863 F.3d at 1153, and I would not address whether § 1252(a)(2)(B)(i) authorizes general or collateral challenges to USCIS's policies and practices, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1988) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (citation and quotation marks omitted)).

## II.

Pavani Peddada's claims are ripe. During the pendency of this litigation, she applied for and was denied adjustment of status based on USCIS's challenged policies and practices. Therefore, we must address whether statutory jurisdiction exists to review the USCIS's individualized denial of her application for adjustment of status. *See CSS*, 509 U.S. at 57.

On that issue, I agree that the district court lacked statutory jurisdiction because individualized decisions on applications for adjustment of status, even for applicants who are not removable when they file their application, can be challenged only through removal proceedings, over which this court, not the district court, has judicial review.**[2]**

---

[2] As the Supreme Court has recognized, "in most circumstances, the same act that would ripen a claim would also bring the claim within the reach of the statutory bar to federal court jurisdiction, thus requiring the plaintiffs to bring their claims at the time envisioned by the statutory scheme of judicial review." *City of Rialto v. W. Coast Loading Corp.*,

*Nasrallah v. Barr*, 590 U.S. 573, (2020) (a noncitizen may obtain "direct 'review of a final order of removal' in a court of appeals" (quoting 8 U.S.C. § 1252(a)(1)). In my view, the Government has the stronger argument regarding the interpretation of § 1252(a)(2)(B)(i) considering the statutory text and context, and any ambiguity about the meaning of "relief" in this provision cannot be resolved by the presumption of judicial review for the reasons explained by the majority.

Additionally, because USCIS made an individualized determination on Pavani Peddada's application for adjustment of status, any generalized or collateral challenge that she asserts to USCIS's policies and practices presents an "abstract disagreement[]." *Abbott Lab'ys*, 387 U.S. at 148. That is, Pavani Peddada can no longer be deemed to assert any truly collateral claims because the policies and practices that she challenges were directly applied to her in denying her application for adjustment of status. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (the Supreme Court has long distinguished between "direct review of individual denials" of applications and "general collateral challenges to [unlawful] practices and policies."). Therefore, there is no cause in this case to address whether § 1252(a)(2)(B)(i) preserves review of collateral challenges.

For these reasons, I respectfully concur in part and concur in the judgment.

---

581 F.3d 865, 874 (9th Cir. 2009) (citing *CSS*, 509 U.S. at 60). And here, Pavani Peddada's challenges to USCIS's general patterns and practices can "receive [ ] practical judicial review within the scheme established by [statute]." *Cf. CSS*, 509 U.S. at 61.